## Case No. 4,953.

### The FORTITUDE.

[3 Sumn. 228;[1] 1 Law Rep. 124.]

Circuit Court, D. Massachusetts. May Term, 1838.

[1] [Reported by Charles Sumner, Esq.]

STORY, Circuit Justice. The question now submitted is, whether the master of the ship, it being a suit on a bottomry bond. and the necessity of the repairs being denied by the answer, is a competent witness to establish the necessity of the repairs. The suit is in rem; and indeed no personal suit would lie against the owner. If the master is admissible to prove the necessity of the repairs, then it is plain, that, if a decree is obtained by the libellant, the master is discharged from all further responsibility. So that he has a direct interest in the event of the suit under this aspect, and will by his own testimony exonerate himself from all liability to the libellant. Then. does he stand indifferent from an opposing interest? Certainly he does not, if the decree in rem will exonerate him also from all liability to the owner of the ship. The question, then, arises. whether the decree in rem will be conclusive as to the necessity of repairs, in a suit brought by the owner of the ship against the master? I think it will, for two reasons; (1.) A decree in rem. as to the direct point decided in it, (and here the necessity of the repairs must be directly decided,) is conclusive in all other cases. In case of asserted forfeiture, the decree of acquittal or condemnation is conclusive, not only as to the property, but as to the point of forfeiture, or not. So it was adjudged in Rose v. Himely. 4 Cranch [8 U. S.] 241. and in Gelston v. Hoyt. 3 Wheat. [16 U. S.] 246. (2.) In the next place. the owner cannot found any claim against the master. but upon producing the proceedings and the decree in admiralty. for his loss and damage grew out of that.

If so, the decree is evidence not merely of the fact of the decree of sale, but of the validity of the bottomry bond, and the necessity of the repairs. I do not say, that it is conclusive; that is not necessary to say in the point of view in which I am now looking to the case. It is sufficient if it be primâ facie evidence in the case, in favor of the master. If it be the latter only, can he be a witness, thus to create evidence in his own favor in such a suit? I think not. But if it be evidence at all in such a suit, (and that it is cannot be doubted), then it seems to me, that it must be conclusive as to the very hinge of the controversy.

Now I find, that in another class of cases, far less imposing and clear, a very able admiralty judge, (the late Judge Peters), decided, that the master is not a competent witness against the seamen. I mean in cases of libels for seamen's wages, brought by a suit in rem against the ship; or in personam against the owner of the ship. He gave, as a reason, that the decree in rem would be evidence in favor of the master in a suit brought in personam against him by the seamen for the same wages. And he applied the same reasoning to a suit in personam against the owner. In Malone v. Bell [Case No. 8,994], which seems to have been a suit in personam against the owner, the master was offered as a witness by the owner, and the learned judge said; "If a decree passes against the seamen in a procedure in rem, or against (it should be for, and is an obvious mistake) the owner, it may be given in evidence to repel a suit against the master." And he accordingly rejected the master's testimony. In Jones v. The Phoenix [Id. 7,489], the learned judge recognized the same doctrine in a suit in rem. In Atkyns v. Burrows [Id. 618], the same learned judge rejected the master as a competent witness for the owner, to prove that he had rightfully displaced the mate, (the libellant), from his station; and stated, that he was liable over in damages to the owner for his misconduct, in discharging the mate. if improper. The same doctrine was admitted at the bar, and acted upon by the court, in Galloway v. Morris. 3 Yeates. 445. In Robinett v. The Exeter, 2 C. Rob. Adm. 261. the master, under the like circumstances. was rejected as a competent witness. These cases are certainly far less cogent in favor of the rejection of the testimony of the master, than the present. In short, the whole merits of this controversy turn upon the master's conduct. If this suit were upon a policy of insurance by the owner against the underwriters, and the defence were barratry. or deviation by the master, he would not be a competent witness for the owner to establish the contrary fact. So, if a suit were brought against the owner, founded upon his misconduct or negligence, he would not be a competent witness for the owner to disprove his negligence or misconduct.

I am aware of the cases cited at the bar at common law. One answer is, that they are all suits in personam, though I confess, that I do not well see how all of them can be supported on that distinction. The case of Evans v. Williams, 7 Term R. 481, note c, may possibly have turned upon another point; not the necessity of borrowing, but the misapplication of the money when borrowed. Milward v. Hallett, 2 Caines, 77, and Rocher v. Busher, 1 Starkie, 27, proceeded on the same ground as Evans v. Williams, and indeed was very similar in its circumstances. If these cases are not reconcilable with the principles which ·I have already stated, I shall still adhere (at present) to the doctrine, that, in proceedings in rem turning upon the very point of the necessity of the repairs, the master is not a competent witness. At the same time, I am ready to confess, that I am not confident, that this opinion rests upon grounds so clear, that it ought not to yield to a settled course of practice; and I greatly fear, that there is no authority, which directly sustains it. Deposition rejected.

At a later day, the following opinion was pronounced on the merits of the whole case:

STORY, Circuit Justice. This is the case of a suit on a bottomry bond, executed at Calcutta on 21st of December, 1836, on the ship Fortitude, by one Jeremiah Spalding, the master thereof, in favor of the libellant. The libel asserts, that the money was advanced to supply the necessary repairs for the ship; and the defence set up is, in substance, that the repairs made, and for which the money was advanced, were, with a trifling exception, unnecessary and not required by the state and condition of the ship. And the respondents have, accordingly, imputed gross misconduct and want of judgment, and, indeed, the more grave offence of meditated fraud to the master. They have not, however, imputed any connivance or participation in that misconduct or fraud to the lender; although they do certainly rely upon his want of the exercise of due diligence in making inquiries as to the true state and condition of the ship. The cause has been most elaborately argued by the counsel on both sides, upon the principles of law applicable to the case, as well as upon the facts; and I propose to examine, in the first instance, those principles of law, as I cannot but think, that when well understood and clearly defined, they will greatly aid us in coming to a right conclusion as to the material facts, which ought to govern the judgment of the court.

It is agreed on all sides, that the master is to be treated as the general agent of the owner or employer of the ship, as to procuring repairs and supplies for the ship, in a foreign port, in the absence of the owner or employer. And it is equally agreed, that this power is not unlimited; but is restricted to such repairs and supplies as are, in a just sense, necessary for the ship under the actual circumstances of the voyage. But as to what is the true meaning of the word "necessary," or in other words, as to what repairs or supplies are to be deemed necessary in the sense of the rule, the learned counsel widely differ; the counsel for the respondents contending, that the repairs must be positively and absolutely necessary for the voyage in a strict sense; and the counsel for the libellant as strenuously contending, that all that is required is, that they should be reasonably fit and proper for the occasion. The respondents' counsel have placed great reliance in support of their po sition, upon certain language to be found in some of the text-books and authorities upon this subject, where it is suggested that the master's authority is confined to cases of actual necessity, of great extremity, of extreme necessity, of great and invincible necessity, and of absolute necessity. Language like this may undoubtedly be found in the text-books and authorities, sometimes used in a very loose and inexact manner, and sometimes looking to the subject-matter immediately in judgment, exceedingly appropriate, and, understood ·with its just limitations, entirely accurate. As far as I have been able to examine the authorities and text-books cited to sustain these intensive expressions oi necessity, they are used in reference to bottomry bonds, as contradistinguished from other ordinary contracts for repairs. There is a manifest difference between that necessity which will justify repairs, and that superadded necessity, if I may use such an expression, which will justify the giving of a bottomry bond. To justify the giving of a bottomry bond, it is not only essential that there should be a necessity for the repairs, but that there should also be a necessity of resorting to a bottomry bond, in order to procure the proper funds to defray the expenditure. If the master has funds of his owner in his own possession, or if he can procure funds upon the personal credit of the owner, he is not ordinarily at liberty to resort to a bottomry loan. In short, it is only when this is the only or the least disadvantageous mode of borrowing, that the master is at liberty to resort to it as a dernier resort. The giving of a bottomry bond is, therefore, properly said to be justifiable only in cases of great extremity, of urgent necessity, or of extreme pressure. In cases of bottomry, the expressions may be appropriate, when they would be utterly inapplicable to common cases of repairs. See Heathorn v. Darling, 1 Moore P. C. 6, 14.

The distinction here alluded to is expressly stated in the case of The Aurora, 1 Wheat. [14 U. S.] 102, where it is said by the court: "The law in respect to maritime hypothecations is, in general, well settled. The master of the ship is the confidential servant or agent of the owners, and they are bound

to the performance of all lawful contracts made by him, relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use. This rule is established, as well upon the implied assent of the owners, as with a view to the convenience of the commercial world. As, therefore, the master may contract for repairs and supplies, and thereby, indirectly, bind the owners to the value of the ship and freight, so, it is held, that he may, for the like purposes, expressly pledge and hypothecate the ship and freight, and thereby create a direct lien on the same, for the security of the creditor. But the authority of the master is limited to objects connected with the voyage, and, if he transcend the prescribed limits, his acts become, in legal contemplation, mere nullities. Hence, to make a bottomry bond executed by the master a valid hypothecation of the ship, it must be shown by the creditor, that the master acted within the scope of his authority; or, in other words, it must be shown, that the advances were made for repairs and supplies necessary for effectuating the object of the voyage, or the safety and security of the ship; and no presumption should arise, that such repairs and supplies could be procured upon any reasonable terms with the credit of the owner, independent of such hypothecation. If, therefore, the master have sufficient funds of the owner within his control, or can procure them upon the general credit of the owner, he is not at liberty to subject the ship to the expensive and disadvantageous lien of an hypothecatory instrument." And again (page 506) it is added: "It is incumbent upon the creditor, who claims an hypothecation to prove the actual necessity of those things which give rise to his demand; and if from his own showing, or other wise, it appears, that he has funds of the owner in his possession, which might have been applied to the demand, and he has neglected or refused so to do, he must fail in his claim." Nor is there any thing new in this statement. The same doctrine will be found laid down in all the leading elementary treatises and authorities, as incontrovertibly established. See 3 Kent, Comm. (3d Ed.) lect. 46, p. 171; 2 Emer. Traité à la Grosse, c. 4, §§ 6, 11; Abb. Shipp. 125 (Am. Ed. 1829), and note 2, and cases there cited; Moll. bk. 2, c. 11, §§ 11, 12; The Virgin, 8 Pet. [33 U. S.] 538; The Nelson, 1 Hagg. Adm. 169, 175; Jac. Sea Laws. bk. 4, c. 2, p. 359, by Frick; 1 Bell, Comm. (4th Ed.) 430–434; The Rhadamanthe, 1 Dod. 201, 206; The Alexander, Id. 278, 280; Pard. Droit Com. tom. 3, n. 910, 911, pp. 509, 510.

Let us proceed, then, to the consideration of what, in the sense of the law, are necessary repairs, for which, when ordered by the master, the owner would be liable in case no bottomry bond had been given. Now, we all know, that where money is advanced in a foreign port, for necessary repairs, the owner is liable for the amount advanced for such repairs in a suit in personam at the instance of the lender. And if the work is done, and materials furnished for such necessary repairs in a foreign port, the material men and workmen, if unpaid, have a treble remedy, by a suit in personam against the master, and by a like suit against the owner, and by a suit in rem in the admiralty to enforce the lien given to them by the maritime law. This doctrine is well established; and the right to proceed in rem has been fully recognized by the supreme court of the United States. This inquiry is the more important, because, if the repairs made were, in the sense of the law, necessary repairs, for which the owner would have been personally liable in the manner above mentioned, if no bottomry bond had been taken; then it seems to me, that, if the necessary funds in order to make those repairs could not otherwise be obtained, and the bottomry bond was bonâ fide entered into by the lender, it would be extremely difficult to show, that it ought not to be upheld by this court. In relation to what are necessary repairs in the sense of the law, for which the master may lawfully bind the owner of the ship, I have not been able, after a pretty thorough search into the authorities and text writers, ancient and modern, to find it any where laid down in direct or peremptory terms, that they are such repairs, and such repairs only, as are absolutely indispensable for the safety of the ship, or the voyage, or that there must be an extreme necessity, an invincible distress, or a positive urgent incapacity, to justify the master in making the repairs. The general formulary of expression found to be laid down is, simply, that the repairs are to be necessary, without in any manner pointing out, what repairs are, in the sense of the law, deemed necessary, or what constitutes the true definition of necessity. But a thorough examination of the common text writers, ancient as well as modern, will, as I think, satisfactorily show, that they have all understood the language in a very mitigated sense; and that necessary repairs mean such, as are reasonably fit and proper for the ship under the circumstances, and not merely such as are absolutely indispensable for the safety of the ship or the accomplishment of the voyage. The Roman law manifestly took this view of the matter. In commenting upon the Pretor's edict, De Exercitoria Actione, it is well remarked by Ulpian, that as we are obliged from necessity to contract with masters of ships, of whose character and condition we are ignorant, it is equitable that the owner should be bound by his acts; and that the case is stronger than that of a contract with the clerk of a shopkeeper; for sometimes in the case of the master of a ship, neither the time nor the place allow us the opportunity of full deliberation. "In navis magistro non ita est; nam interdum locus, tempus non patitur plenius deliberandi concilium." Dig. lib. 14, tit. 1. And, there-

fore, the owner is held to contracts made in good faith with the master, since otherwise the persons contracting might suffer from his frauds. "Omnia facta magistri debet praestare qui eum praeposuit; alioquin contrahentes decipientur." This consideration may not be unimportant in reviewing other parts of the present case. Id. l. 1, § 5. The text of the Roman law then proceeds to state the right of the master of the ship to bind the owner as being limited to the concerns of the ship; "Ejus rei nomine cujus ibi praepositus fuerit, id est, in eam rem praepositus sit;" and illustrates it by reference to his ordinary power to buy things proper for the navigation of the ship or for repairing the ship; "utputa, si ad onus vehendum locatum sit: aut aliquas res emerit utiles naviganti; vel si quid, reficiendae navis causa contractum, vel impensum est." Id. l. 1, § 6; Id. l. 4, § 5. And it then declares, that if he borrows money for the same purpose, "ad usum ejus rei, in quem praepositus est," as, for example, to repair the ship, the owner will be liable therefor, even though the master should afterwards convert the money to his own use, (Id. l. 1, § 6; Id. l. 7; Emer. tom. 2, c. 4, § 5), if the creditor lent the money bonâ fide, and the ship stood in need of repairs and he knew it. "Si cum pecunia crederetur, navis in ea causa fuisset, ut refici deberet,—si illud quoque scierit necessarium refectioni pecuniam esse." Dig. lib. 14, tit. 1, l. 7; Poth. Pand. lib. 14, tit. 1, n. 7, 8; Emer. tom. 2, c. 4, § 5. It seems difficult to avoid the conclusion, that the Roman law understood that the owner was liable in the exercitorial action for all repairs, which the master, virtute officii, had an implied authority to order; and that the repairs which he had a right to order were not such as were strictly indispensable, but such as were reasonably useful and proper (utiles), and that money might be safely lent by the lender, whenever there existed such a good cause for repairs. But still the lender even in such a case, had a right to lend no more than was necessary for the repairs,—"Multo tamen magis pecunia credita fuerit quam ad rem esset necessariam non debere in solidum adversus Dominum Navis actionem dari,"—and if he did wantonly and knowingly lend more, then the owner was not responsible. Emerigon and Voet seem so to have interpreted the Roman law. Emer. Traité des Contrats à la Grosse, tom. 2. cc. 4, 5, 7, § 8; Voet ad Pand. lib. 14, tit. 1, §§ 3, 6. Cujacius has expounded it in the same manner in an ample commentary, illustrating the doctrine by stating, that if the creditor lends money to buy a sail for the ship, he must shew, that the ship wanted the sail, not that it was indispensably necessary. "Necesse erit probandi se veli emendi causa credidisse, et velo navem indiguisse." Cujacii Opera, tom. 1. cols. 1450–1453, ad Leg. 7; Dig. lib. 14, tit. 1, Afric. Quest.

In looking into the regulations customary or positive of modern commercial nations,

it will be found, that language is used, which admits, if it does not absolutely require a similar force of the word necessary. The Consolato del Mare requires the merchant or shipper to lend to the master money, when it is necessary to procure rigging or other things necessary for the ship; and authorizes the master to buy whatever equipments or other things are necessary for the ship. The laws of Oleron (article 1) authorize the master to pledge the ship, if he needs money to defray the expenses of the ship. "Si après le départ, le maître d'argent pour les depens de la nef, il peut mettre aucun d' appareux en gage," &c. Consolato del Mare, cc. 106, 107; Pard. Coll. Lois Marit. tom. 2, pp. 109, 110; Id. p. 224, c. 239; Emer. Traité à la Grosse, tom. 2, c. 4, § 5. The laws of Wisbuy, (article 13) declare, that if the master is in need of provisions or supplies, he may pledge a part of his equipments therefor. Emer. Traité à la Grosse, tom. 2, c. 4, § 5. The old Hanseatic ordinance (article 60) declares, that, if the master stood in need of money for the ship in a foreign country, he might take it up on bottomry, if he could not do better. "S'il a nécessité et besoin d'argent pour le navire." Id. The new Hanseatic ordinance (article 6, § 2) is more impressive. It provides, that if the master in foreign places perceives a probable damage in the ship or its equipments, and he cannot obtain money on exchange, and has not goods in the ship, which he can sell more for the benefit of the owner than to take up money on bottomry, he may do the latter. "Si nauclerus in caeteris locis, et probabile damnum in navi, aut instrumentis navis perceperit, ac isthic loci nullum cambium ad exercitores transmittendum obtinere queat, &c.; tum hoc in casu necessitatis pro servanda navi et bonis habeat potestatem summae universarum Exercitorum tantum pecuniae sub faenore nautico accipiendae, quantum ad reparationem damni et alios similes casus necessitatis opus habet." Id.; Pard. Coll. Lois Marit. tom. 2, 527; Id. 547; Emer. tom. 2, c. 4, § 11. "Le Guidon de la Mer (chapter 5, art. 35) states: "Après la tourmente passée et les damages souferts, le maître pour restaurer son navire peut prendre argent sur le quille," &c. Emer. Traité à la Grosse, tom. 2, c. 4, § 5; Pard. Coll. Lois Marit. tom. 2, p. 396. The French ordinance of 1681 (article 19, of the captain) declares, that the master may, in the course of his voyage, take up money upon the body and keel of the ship for the repairs, provisions, and other necessities of the ship, "pour radoub, victuailles, et autres nécessités du batiment." In the interpretation of this ordinance it has been held by the ablest commentators, Valin and Emerigon, that, at most, nothing more than an apparent necessity and good faith on the part of the lender are necessary to make a bottomry

by the master valid for repairs. Nay, it seems, that if the lender act in good faith upon the representations of the master, the bottomry will be valid, even if no necessity for the repairs really existed. Emer. Traité à la Grosse, tom. 2, c. 4, §§ 5, 7, 8, 11; 1 Valin, Comm. liv. 2, tit. 1, art. 19, p. 441; Id. liv. 1, tit. 14, art. 16, p. 362. See, also, Ersk. Inst. B. 3, tit. 3, §§ 44, 46; 1 Stair. Inst. by Brodie, B. 1, tit. 12, §§ 18, 19; Poth. Obl. 448, note.

The language of the earlier commentators upon the Roman law and the maritime law, as to this subject, is somewhat indeterminate; but their total silence, as to any intense phrases or qualifications implying absolute or indispensable necessity, seems to justify the conclusion, that all which was required on the part of the lender, was to ascertain, that there was a fair ground to believe, that the advances for the ship were reasonably fit and proper for its wants. Thus Peckius in his commentary on the Digest, de Exercitoria Actione, says: "Africani igitur praecepta creditorem observare oportet, quae haec sunt, quod sciat navem in ea causa esse, ut refici debeat; quod credat in eam causam contrahi; quod exprimat refectionis gratia mutuum se credere." Peck. Opera Omnia de Exercit. Actione, p. 838; S. P. Vinnius. Peck. ad Rem Nauticam, de Exerc. Actione, pp. 98, 99, 183. Vinnius in his notes on Peckius says: "Si navis instruenda aut reficienda sit, et magister in eam rem pecuniam mutuetur, etiam hoc casu actio in exercitorem dabitur. Caeterum non alios utiliter aget creditor, quam si concurrant illa omnia, quae hic exigit Africanus. Summa est; (1) ut navis in ea causa fuerit, ut refici deberet; (2) ut sciat se credere in hoc ipsum, cui sit aliquis magistri navis jure et nomine praepositus; (3) ut non major pecunia credita sit, quam navis reficiendae opus fuerit; (4) ut eo loco credita sit pecunia, in quo id, propter quod numerabatur, comparari potuerit." Vinnius, Peck. ad Rem Naut. de Exercit. Act. p. 183. And he repeats the same suggestions in his own commentary on the Institutes. Vinnius ad Inst. Lib. 4, tit. 7, § 2, nota 4. Marquardus, in his Treatise on Maritime Law, uses the following language: "Adeo autem favorabile est hoc refectionis navalis privilegium, ut si magister navis cavit se accipere in refectionem navis, etiamsi, in eam causam non impenderit, sed in suos usus converterit, tamen teneatur Exercitor. Marquardus, de Jure Marit. lib. 2, c. 5, p. 225, n. 27. Stypmannus says: "Si vero extra provinciam est, et navis indigeat, ex. gr. si vela emenda vel alia armenta, potest magister navis. pro resarciendo damno, quod navis a tempestatibus accepit, quantum est opus periculo exercitorem sumere; et quod ita accipit, tenentur exsolvere." He adds in another place: "Debet autem damnum in cujus reparationem pecunia accipitur, verum, non simulatum, vanum, aut imaginarium esse." (Stypmannus ad Jus Marit. p. 4, c. 5, n. 106, 107. 113–135. pp. 417–419); citing with approbation the commentary of Cujacius on the law of Africanus. Loccenius says: "Si navis reficienda aut instruenda sit, et magister in usum navis reficiendae aut instruendae, cui praepositus est, pecuniam, fuerit mutuatus, etiam si hoc non sciverit exercitor, tamen in exercitorem actio dabitur." He then puts the case of the money being misemployed; and states, that the owner is still bound; and then adds: "Sed et creditorem incautum esse decet eo ut dispiciat an in eam causam impendat pecuniam magister navis, in quam ab ipso mutuatus est; vel num iis impensis navis jam opus habeat, in quas ipsi crediderit pecuniam; num navis in ea causa sit, ut refici debeat." Locc. de Jure Mar. lib. 3, c. 7, notes 6–8. Kuricke is far more direct: "Potest vero nauclerus in locis peregrinis faenus nauticum accipere; (1) si probabile damnum in navi et instrumentis navilibus adpareat; (2) si isthic loci cambio, sub fide exercitorum pecuniam ab exercitoribus solvendam comparare non queat; (3) si non habeat in navi bona, quae majori cum commodo exercitorum vendi, quam faenus nauticum contrahi, possint; (4) ne ultra quam ad reparationem damni, et similis casus necessitatis, opus est, accipiat." Kuricke Ins. Marit. Hans. ad tit. 6, art. 2, p. 765. Casaregis speaking of the greater liberty of the law in maritime affairs, says: "Quod exercitores remaneant obligati pro pecunia ad cambium capitaneo data in usum navis, absque onere creditoribus justificandi versionem pecuniae in illius utilitatem, juxta textum leg. ultimae, ff. de Exerc. Actione." Dig. lib. 14, tit. 1, c. 7. He adds: "In casu etiam generalis vel illimitatae praepositionis non potest aliquis cum magistro contrahere, nisi vero sciat navim indigere &c. Si vero contrahenti constaverit, quod navis non erat in ea causa, ut indigeret, vel saltem tanto non indigeret, tunc nulla ei dabitur actio contra navem ac exercitores." And he recognises in its full force the doctrine of the Digest, that the owner is bound, if the master procures things useful for the navigation of the ship, or to repair her: "Si aliquas res emerit utiles naviganti, vel si quid reficiendae navis causa contractum," (Casaregis Disc. 71, n. 12–14, 32, Dig. lib. 14, tit. 1, l. 1, § 7), as well as the doctrine of Africanus. Id. Disc. 71, n. 33. Roccus is equally significant in the passage cited at the bar. "Mutuans pecuniam magistro navis pro refectione ipsius navis aut ad hoc, ut aliquas res emerit utiles naviganti; vel pro salario nautarum, vel ad armendam. et instruendam navem, semper dominus obligatus remanet." Roccus de Nav. et Naul. n. 23. He then adds: "Verum, nota circa hoc, quod si magister navis decipiat creditorem in mutuo pro dicta refectione vel in pretio rerum emptarum, hoc ad onus domini et exercitoris cedit, non autem ad onus creditoris." Roccus de Nav. n. 24. And he then proceeds to lay down the four rules already cited from Vinnius. In truth the whole of these writers have borrowed and adopted the expositions of Cujacius on this same subject, who has

laid down the same rules, the principal of which points to the duty of the creditor to ascertain, "an navis indigeat refectione; ut re vera navis indiguerit refectione; satis est si navis reficiendae causa crediderit, et in ea causa fuerit navis, ut refici deberet." Cujacii Opera, tom. 1, col. 1451, 1452; Ad Afric. Tract. 8.

I have been the more full in these citations from the older writers—most of which will be found collected in Emerigon and Boulay-Paty (Emer. Traité à la Grosse, tom. 2, c. 4, §§ 5, 11; Boul.-P. Dr. Com. tom. 2, § 14, p. 62, etc. See, also, Valin, Comm. tom. 1, lib. 2, tit. 1, art. 19),—because, unless I greatly misunderstand the purport of their expressions, they inculcate a very different doctrine from that which has been supposed at the argument to be the general result of the maritime law. These writers use no intensive expressions as to the necessity of the repairs. Their language imports no more than what is meant by our common English phrase, that the ship needs or stands in need of repairs ut refici deberet; and some of them press it further by requiring no more than a probable damage or probable cause of repairs. So that at most these writers leave the whole subject open to a liberal interpretation of what constitutes necessary repairs; and relieve the court from all necessity of qualifying their language. The doctrines maintained by Valin and Emerigon on this subject have been already stated; and their authority upon questions of maritime law is justly entitled to very great weight. The modern Code of Commerce of France authorizes the master to take up money on bottomry, if, during the course of the voyage, there is a necessity of repairs, or to buy provisions, after having verified the same by a report drawn up and signed by the principal officers of the crew. "Si pendant la cours du voyage il y a necessité de radoub, ou d'achat de victualles." Code de Commerce, art. 234; and see 2 Emer. Traité à la Grosse, c. 4, § 5; Boul.-P. Dr. Com. (Ed. 1827) pp. 461, 462. And it declares the master, who shall, without necessity, have taken up money on bottomry, or have given a false account of damages sustained, responsible to the owners, without prejudice to a criminal prosecution against him, if there be good cause. Code de Commerce, art. 236. The modern commentators upon this code agree, that if the lender has acted in good faith, the ship is responsible, notwithstanding there may not have been a positive necessity for the repairs. Thus, Pardessus says: "Les Armateurs ne peuvent refuser d'acquitter les engagemens pris pour ces causes et avec ces formalités, sous pretexte qu'ils entendent contester, ce, qu'a fait le capitaine—ou que l' emprunt n'etoit pas reellement necessaire, et que le capitaine a supposé des besoins." Pard. Dr. Com. tom. 3. n. 911. Boulay-Paty holds the same doctrine; using the words, "pour les necessités du navire. et pour les besoins du navaire," as equivalent expressions. Boul.-P.

Dr. Com. tom. 2, § 14, pp. 62, 64, 68, 69, 75. But what is more important, each of these authors lays down the general authority of the master to do, in the absence of the owner, what he shall judge to be most proper for the safety of the ship, and the success of the voyage. "Tout ce qu'il jugera convenable" (says Boulay-Paty) "pour le salut du batiment, et le succes de l'expedition." Id. tom. 1, § 1, p. 262. "Lorsque l'Armateur est absent, &c. il est presumé s'en etre rapporté au capitaine (ses pouvoirs)" (says Pardessus) "et l' avoir autorisé a faire les depenses, qu'il jugeroit necessaires. même dans le lieu de l' embarquement et avant le voyage commence." Pard. Dr. Com. tom. 2, pt. 3, tit. 2, c. 1, § 626, pp. 58, 59.

But assuming the law of continental Europe to be different from what I have supposed; still, after all, we must be governed by that law, which prevails in our own jurisprudence. Now, it seems to me clear, that, by our law, the master has a right in a foreign port to bind the owners for all supplies and repairs of the ship, which, in the liberal sense of the terms, are deemed necessary supplies and repairs; that is, such as are reasonably fit and proper for the ship and the voyage. Lord Tenterden, in his excellent treatise on Shipping (Abb. Shipp. [Ed. 1829] pt. 2, c. 3, § 3, p. 102), lays down the proposition in the following exact and perspicuous language: "In order, however, to constitute a demand against the owners, it is necessary that the supplies furnished by the master's order should be reasonably fit and proper for the occasion, or that money advanced to him for the purchase of them should, at the time, appear to be wanting. for that purpose. The contrary in either case would furnish a strong presumption of fraud or collusion on the part of the creditor. The proper mode of ascertaining what is necessary is. to ask what a prudent owner himself would have done, had he been present." In Webster v. Seekamp, 4 Barn. & Ald. 352, the very question was before the court, in a case where the plaintiff had coppered a ship at the request of the master, the owner being in the same country. and brought his suit against the owner for the amount. The defence was, that the coppering was not absolutely necessary for the voyage; and it was found at the trial, that it was extremely useful to copper vessels on such a voyage. but not absolutely necessary; for many vessels went the same voyage without being coppered. The judge at the trial put the question to the jury, whether the copper was useful and proper for the voyage; and whether it were such as a prudent owner himself, if present, would have ordered. The jury found that it was, and the plaintiff obtained a verdict. Upon a motion for a new trial, the court affirmed the ruling of the judge at the trial. Lord Tenterden on that occasion said: "I am of opinion, that whatever is fit and proper for the service on which a vessel is engaged, what-

ever a prudent owner would have ordered, if present at the time, comes within the meaning of the word 'necessary,' as applied to those repairs done or things provided for the ship by order of the master, for which the owners are liable;" and he rejected the suggestion, that they should be absolutely necessary as too narrow, and, in many cases, impracticable. The other judges concurred on the same ground; and Mr. Justice Best added: "No man can say, what is absolutely necessary. If the topmasts were lost, a vessel might sail without them, and possibly perform her voyage with safety. A topmast might, therefore, be said not to be absolutely necessary. Yet no prudent man would proceed to sea without it." Mr. Chancellor Kent has maintained a similar doctrine in his learned commentaries, stating that "the supplies must appear to be reasonable, or the money advanced for the purpose of them to have been wanting; and there must be nothing in the case to repel the ordinary presumption, that the master acted under the authority of the owners." 3 Kent, Comm. (3d Ed.) lect. 46, p. 163. See, also, Ross v. The Active [Case No. 12,070]; Phillips' Benecke, etc., on Average, 174–179; United Ins. Co. v. Scott, 1 Johns. 106. And such I conceive to be the established American law.

All the analogies of the law lead to the same conclusion. Thus, we all know, that infants are generally incapable of binding themselves except by contracts for necessaries, for necessary food, necessary clothing, and necessary means of instruction. In what sense does the common law interpret the meaning of such necessaries? Certainly not as limited to things absolutely and indispensably necessary; for then bread and water, the coarsest and meanest clothing, the narrowest means of the humblest knowledge would be the most, which could justifiably be embraced in such an interpretation. On the contrary, we all know, that necessaries for an infant, in the sense of the common law, are such as are suitable for his rank, degree, condition, and objects in life; and that a spirit of liberal allowance and enlightened policy governs in this matter, to attain the ends by the appropriate and best means. The same rule applies to cases where husbands are made responsible for necessaries furnished to their wives, either under ordinary or extraordinary circumstances. And, indeed, it will be difficult to find any department of the law, in which the same doctrine does not pervade the whole structure of its principles. The whole theory of the law of bailments turns upon it; as does also that of general agency.

Some criticism has been employed upon the words "moral necessity," as applied to the conduct of the master acting in cases of this sort; and it has been more than intimated, that the expression is quite new, and can scarcely be traced beyond the case of Gordon v. Massachusetts F. & M. Ins. Co., 2 Pick. 249. It does not appear to me, that the criticism has any just foundation, or that the expression is either new or inapt. It seems to me to indicate precisely that which such a case requires. Moral necessity arises, where there is a duty incumbent upon a rational being to perform, which he ought at the time to perform. It presupposes a power of volition and action, under circumstances in which he ought to act, but in which he is not absolutely compelled to act by overwhelming superior force. Indeed, I hardly know how a case of physical necessity can correctly be said to exist in cases where an agent is called upon to exercise judgment and discretion, to act, or not to act. Take the case of the master of a ship in a storm of imminent peril, where a jettison seems required, or masts are to be cut away to save the ship from foundering at sea. The master is called upon to act; but even in such an extremity he has a choice; and when he acts, he acts, properly speaking, upon his judgment, under a moral, rather than a physical necessity. But in ordinary cases, where a master orders repairs or supplies for the ship, it would be an entire deflection from the true use of language to call it a case of physical necessity. So far as the master is concerned, it is his duty to procure suitable repairs and supplies, in order to enable him to save the ship and prosecute the voyage; and this sense of duty, when it becomes imperative by its urgency upon his conscience and judgment, constitutes what is most appropriately called a moral necessity. No one can correctly say, in such a case, that the master is under a physical necessity to make the repairs, or to procure the supplies.

In the course of this examination I have not thought it proper to refer to the cases of sales by the master of the ship or cargo, or both, because they do not belong to his ordinary duties; and are only superinduced from an overwhelming or extreme necessity, which requires him to act in unforeseen emergencies for the best interests of all concerned. The Gratitudine, 3 C. Rob. Adm. 240, and Petapsco Ins. Co. v. Southgate. 5 Pet. [30 U. S.] 604, and Winn v. Columbian Ins. Co., 12 Pick. 279, 283, 286, fully illustrate the doctrine of such cases.

Then, as to another point suggested at the argument, viz.: that the creditor, who lends money, is bound to use due diligence in ascertaining, whether it is wanted for repairs and supplies; and to advance no more than is reasonably necessary for such a purpose. I entirely agree to the doctrine, when it is interpreted with what I consider to be its true and just limitations. The point can only arise, where no necessity for the repairs or supplies exists, and where, by the use of reasonable diligence, the absence of such necessity could have been known and ascertained. If the repairs and supplies are necessary, then the creditor will be entitled to recover the amount from the owner (for I am speak-

ing of cases of ordinary supplies and repairs, where no bottomry bond is taken), without making any inquiry whatsoever. On the other hand, if no inquiries whatsoever could have put the creditor in possession of the real facts, and he has acted upon the representations of the master, with good faith and under circumstances affording no ground of suspicion of ill faith in the master, I conceive that he is dispensed from all responsibility in regard to such inquiries. Thus, if he should be deceived in making advances for repairs or supplies for imaginary injuries or losses at sea, which he could have no means of knowing or tracing, but which the master and crew fraudulently pretended to exist, I presume that he would be enabled to recover against the owners for reasonable advances made by him to repair such injuries or supply such losses. Such certainly seems to be the doctrine of the civil law. "Omnia enim facta magistri debet praestare, qui eum praeposuit; alioquin contrahentes decipiuntur; et facilius hoc in magistro, quam institore, admittendum propter utilitatem." Dig. lib. 14, tit. 1, l. 1, § 5. "Sed et si in pretiis rerum emptarum fefellit magister, exercitoris erit damnum, non creditoris." Id. § 10; Emer. Traité à la Grosse. c. 4, § 5; 1 Valin, Comm. lib. 2, tit. 1, art. 19; Cujacii Opera, tom. 1, col. 1451, 1452; De Exerc. Actione. Pothier evidently so understood it; for in his edition of the Pandects, in his preface to the law of Africanus (Dig. lib. 14, tit. 1, l. 7), he says: "Sed etsi specialiter caverit (magister) se ad navis causam mutuari, puta, ad hujus refectionem; ita demum Exercitoria dabitur, si probabile videri potuit, quod ad hanc causam mutuaretur." Poth. Pand. lib. 14, tit. 1, n. 8. It certainly is the doctrine of the French maritime law. Emer. Traité à la Grosse, c. 4, §§ 5, 8; 1 Valin, Comm. lib. 2, tit. 1, art. 19. But where the creditor could by due diligence ascertain the necessity of the repairs or supplies, then, under such circumstances, if he makes no inquiries, and no such necessity in fact exists. he will have no claim upon the owner. Cujacius puts this doctrine in a strong light. "Hoc tantum exiginius, ut non fuerit falsa causa rogandae pecuniae mutuae, ut mutuo non fuerit quaesitus titulus falsus, id est, ut re vera navi indiguerit refectione. et uti hoc certo indagarit ac scierit creditor. Rogas me mutuam pecuniam in refectionem navis, cui dicis te esse praepositum. Ego debeo esse diligens et curiosus, et inquirere antequam numerem pecuniam, an navis indigeat refectione." Cujacii Opera, tom. 1, col. 1451; De Exer. Actione. L. 7, Africanus. But, notwithstanding this strong language. I conceive nothing more is meant than that after due inquiry there should be an apparent necessity for the repairs or supplies; for it is immediately afterwards added, that the creditor need not look to the exact amount required. "Quia non debet inquirere creditor, quanti sit im-

pensa refectionis, vel quanti velum comparare possit, &c. Satis est, si navis reficiendae causa crediderit, et in ea causa fuerit navis, ut refici deberet." Id. Roccus himself admits, that if there be a case of apparent necessity, the owner will be bound, although the master has been guilty of fraud, in the passage already cited. Roccus de Nav. n. 24. Pothier, in his treatise on Obligations (449, note), put the rights of creditors for advances to the master upon the ground of the probable necessity, from the representations of the master. "Pourvuque la Declaration par le contrat d'Emprunt fut vraisemblable." Mr. Bell, in his Commentaries, (1 Bell, Comm. B. 3, pt. 1, c. 5, § 1, n. 454), says; "His (the master's) office holds him out as the accredited agent of the owners, on whose authority all repairs, furnishings of naval stores, subsistence or money necessary for the occasions of the voyage, may be contracted for or advanced on the credit of the owners. The only restraint is the necessity on the part of the furnisher or advancer of money to see, that the supply, which the master requires, is justified by at least apparent necessity." The language already cited from Abbott on Shipping. (part 2, c. 3, § 3), leads to the same conclusion; for it is there said, that "the money advanced should at the time appear to be wanting" for the supplies or repairs. Indeed, it seems to me, that any more strict rule would endanger the interests of all concerned. and more than all others of the owner; for who would be willing to lend a master abroad, if he were compelled to furnish positive proof of the necessity of the repairs or supplies beyond what fair inquiries and what the appearances of things would afford, upon due examination? If there ever was a case, in which the maxim should be applied. that, where one of two innocent persons must suffer, he should suffer who had by his confidence enabled another to perpetrate a fraud, this would seem to be the case, for the reason suggested by the Digest. "Eo usque producendam utilitatem navigantium." Kuricke. in the passage already cited, goes the whole length of the doctrine. "Si probabile damnum in navi et instrumentis navilibus adpareat." And Valin has wisely considered a different rule too subtile and punctilious for the usages of commerce.[3] I have, therefore, no difficulty in holding. that if there is an apparent necessity. at the time, for the repairs and supplies, the creditor, acting with good faith and reasonable diligence, will be justified, whatever may. at' a future time. and under other circumstances. turn out to be the real state of things. The creditor must lend, if he lends at all. upon the faith of what is then known and seen

---

[3] Valin. Comm. lib. 2. tit. 1, art. 19. p. 442. See. also, 2 Valin. Comm. lib. 3. tit. 5. art. 7. Pothier seems to hold a like doctrine. Pothier, Traité à la Grosse, n. 52.

upon due examination; and his rights ought not to be jeoparded by new proofs, which, at a distant period, or in another place, may spring up to create doubts, or to change opinions.

Hitherto, we have been looking to this matter as connected solely with the interests of the creditor and the owner. But a most important consideration remains; and that is, how it affects the rights and duties of the master of the ship. He is clothed with the general authority to make repairs and order supplies in all the exigencies of the voyage. He is compelled by his duty and the confidence of the owner, to act for the best interest of all concerned in the voyage; and to exercise a sound judgment as to what is to be done in new and unforeseen exigencies. According to the doctrine which we have heard, he is bound to act; and yet he must act at his own peril. If he acts with the most entire good faith, upon the purest exercise of his own judgment, with the fullest advice and assistance of other intelligent minds of reasonable skill and prudence upon the spot; yet, if, upon a review of the whole proceedings, other minds, in a distant country, at a different time, and under other local or professional influences, should come to a different conclusion, as to the necessity or the extent of the repairs or supplies, he is to bear the sole responsibility, and to meet in poenam to the full extent (it may be) of his fortune all the consequences, in a suit at the instance either of the creditor or of the owner. Now, I confess, that I should be very reluctant to hold to such a rigid doctrine; a doctrine, in my judgment, utterly unsafe and impracticable for the ordinary purposes of navigation and trade. It is not, to my knowledge, any where established; and I have not hesitated upon many occasions to repudiate it, in that limited administration of public justice, which has fallen to my lot. If it were true, no creditor would dare to lend money to the master of a ship for repairs or supplies; and no master would dare to borrow money for such purposes. An innocent mistake, under circumstances of the highest caution, and the most abundant good faith and reasonable diligence, would be visited with the same effects as gross negligence or fraud. What, under such circumstances, would be the situation of the shipwright or material-man, who should furnish the repairs or supplies in a foreign port? The maritime law gives him a lien on the ship for his necessary repairs and supplies; and when he comes to assert it in the home port of the ship, he is met by the owner with the defence, that no lien attaches; because, although the repairs and supplies have been made in good faith, yet, upon a full re-examination and revision of all the circumstances, the master and themselves have erred in judgment as to the extent or the necessity of the repairs. They were at the time, indeed, apparently neces-

sary and proper in the judgment of those who seemed well qualified by nautical skill and judgment to decide upon the matter; but there is now a weight of better skill and judgment the other way, as to the positive, though not, perhaps, as to the apparent necessity. It seems to me, that such a defence, successfully maintained, would spread an alarm through the whole maritime world. Before I should yield to such a doctrine, I should require the most stringent authority directly on the point. I am not aware of any such authority. Even in the case of the sale of a ship by the master, which can be justified only upon an urgent necessity, no rule so rigid has yet been established; for if such a necessity does apparently exist at the time, and upon the spot, I conceive that the master will be justified even in a sale of a ship, although subsequent events may show that a different course might have been attended with success. See Petapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 605; The Sarah Ann [Case No. 12,342]; The Tilton [Id. 14,-054]; Idle v. Royal Exch. Assur. Co., 8 Taunt. 755; The Warrior, 2 Dod. 288; The Packet [Case No. 10,654]. See, also, Winn v. Columbian Ins. Co., 12 Pick. [Mass.] 279. In the case of a sale of the cargo by the master, which can only be justified by necessity, since he is not ordinarily the agent of the cargo, an apparent necessity would seem to be all that the law requires. In the case of The Gratitudine, 3 C. Rob. Adm. 240, 259, Lord Stowell, alluding to such a case, said: "In such emergencies the authority of agent is necessarily devolved upon him, unless it could be supposed to be the policy of the law, that the cargo should be left to perish without care. What must be done? He must in such case exercise his judgment, whether it would be best to trans-ship the cargo, if he has the means, or to sell it. It is admitted in argument, that he is not absolutely bound to trans-ship. He may not have the means of trans-shipment. But even if he has, he may act for the best in deciding to sell. If he acts unwisely in that decision, still the foreign purchaser will be safe under his acts." In the case of Freeman v. East India Co., 5 Barn. & Ald. 617, which was the case of a sale of the cargo by a master, Lord Chief Justice Abbott said: "A sale of the cargo, or any part of it, by the master, could confer no title on the purchaser, unless there was an apparent necessity for such sale. That question I left to the jury, and they were clearly of opinion, that there was, in this case, no such apparent necessity." It is true, that the other judges, on the same occasion, used somewhat different language, speaking of the necessity, or the absolute necessity of the sale. But I conceive the lord chief justice's doctrine to be the true and exact doctrine.

The case of The Jane, 1 Dod. 461, 464, is still more direct in point; for in that case Lord Stowell puts the support of a bottom-

ry bond mainly on the good faith of the lender. "The question," says he, "then is, whether this was a fair transaction. Whether the money was bonâ fide advanced, on the representation of the master, that he was in want of supplies. By the general law, the master has a right to take up money in a foreign port for the use of his ship. As long as he remains the ostensible master, exercising all the functions of that situation, he has the authority attached to it; ei rei praepositur. It is not alleged, that the master had any personal credit. Had he not resorted to this mode of raising money, the ship might have lain in port, till it perished by decay. I see no reason to suppose the master exceeded his power. It is a power certainly liable to abuse by the extravagance, indiscretion, or dishonesty of the master. But the master is a person selected by the owners themselves. They repose that trust in him, and hold him out to others as trustworthy. The reasoning is not confined to persons employed in this capacity only. It is common to most situations in life. If a domestic servant, employed by his master to purchase necessaries for the use of the house, misapplies goods obtained under that pretence, though the authority is abused, the master is still liable for his acts. The tradesman who supplied the goods is not to be the sufferer, unless it could be shown that there was collusion with the servant for the purpose of defrauding the master, &c. I cannot agree to the doctrine, that the party lending is obliged to see to the application of the money. If there is no collusion, if he has reasonable grounds for believing that the money is fairly borrowed, it is a known principle in that case, that no such obligation is imposed upon the lender, &c. The transaction may be fair in all its parts. But taking it to be otherwise; supposing it to be tinged with a shade of dishonesty in the master, the merchant, if he did not participate in the guilt, could not be affected by it." Now, some part of this language is addressed to the line of the defence at the hearing, where it was suggested, that, at the time of the borrowing, the master was dismissed, or about to be dismissed; that the intention to dismiss was known to the lender; that there was no account of the items which composed the amount of the bottomry bonds, nor of the application of the money. But still it is most clear, that Lord Stowell sustained the bond in that case upon the apparent necessity only, and the fairness of the transaction on the part of the lender, upon the representation of the master. The doctrine of the same great judge, in the case of The Nelson, 1 Hagg. Adm. 169, 175, 176, and The Zodiac, Id. 320, 326, seems to me to have proceeded upon the same views; and it is difficult to imagine any one, in whose enlightened judgment upon a subject of maritime law more confidence would be reposed. See,

also, 3 Kent, Comm. (3d. Ed.) lect. 46, pp. 171, 174.

In short, it appears to me, that all that the maritime law requires, is, that the master should exercise reasonable diligence in ascertaining what repairs and supplies are necessary; and that the creditor should use reasonable diligence to ascertain, if there is such an apparent necessity, as the master has represented; and if he does, and acts with good faith, he will be protected, and the owner be responsible to him for the repairs and supplies furnished by him. Hitherto my observations have been mainly directed to the consideration, what are necessary repairs and supplies, in the sense of the law, for which the master is at liberty to contract; and the circumstances, under which the owner will be bound for such repairs and supplies in common cases. If the repairs and supplies are in a just sense necessary, then it is clear, that if the master has no other known means of meeting the expenditure, he may take up the money therefor upon bottomry. If he has any other funds, which may be properly applied for the purpose; or if he can procure the advances upon the personal credit of the owner, then he is not at liberty to take up the money on bottomry. See Ross v. The Active [Case No. 12,071]. But the onus of establishing, that there were other funds, or that they might have been obtained upon such personal credit, is on the owner, and not on the lender. And, if he has acted in good faith, and without any knowledge or suspicion of the existence of such funds, or personal credit, or could not, upon reasonable inquiry, acquire knowledge thereof, then the owner will be bound, notwithstanding they existed, or might have been obtained. Not only does the doctrine of the Continental Jurists lead to this conclusion; but it seems to me fully supported by the reasoning of Lord Stowell, in the case of The Nelson, 1 Hagg. Adm. 169; The Jane, 1 Dod. 461; The Rhadamanthe, Id. 201; The La Ysabel, Id. 273; The Hero, 2 Dod. 139; and of the supreme court, in The Aurora, 1 Wheat. [14 U. S.] 96; and The Virgin, 8 Pet. [33 U. S.] 538, 550.

If the views which have been thus far suggested are correct, it seems to me that they will greatly narrow the grounds of controversy in the present case, and save us from the necessity of reviewing many of the very elaborate expositions of the facts which have been so fully presented at the bar. But, before I proceed to consider those facts, on which alone, in my opinion, the real controversy must hinge, I wish to take a brief notice of the objection urged at the bar, that neither the libel nor the answer, in this case, is adapted to such a mitigated form of necessity as has been insisted on at the argument; but that they propound a case of unmitigated and absolute necessity. If the objection were well founded, I should

deem it my duty, as this cause was not heard in the court below, to admit the libel and answer to be reformed, so as to bring before the court the true merits. But, supposing the pleadings to be as suggested, still, in a court of admiralty, as the allegations are broad enough to cover the whole merits (if any there be), and upon the maxim, that omne majus in se continet minus, there would be little difficulty in maintaining their sufficiency. Even in the case of pleadings at the common law, in a declaration for a total loss, upon a policy of insurance, there may be a recovery for a partial loss by the same peril. The allegations of the libel are, that at Calcutta "the ship was in great need of reparations, provisions, and other necessaries to render her fit and capable of proceeding thence on her intended voyage back to the said port of Boston; and neither the owners of said ship, nor said Spalding (the master), having any funds or credit there, and the said Spalding being unable otherwise to procure the necessary money to repair, refit and supply said ship for her said voyage, the libellant did, at the request of said Spalding, advance and lend to him, said Spalding, the sum of 11,755 sicca rupees, &c., on the bottomry or hypothecation of said ship," &c. Now, if I have rightly understood the answer, as well as the argument at the bar, some repairs and supplies were necessary at Calcutta; and no argument has been addressed to the court to show, that the master had any other funds, or the owner any personal credit to meet the exigency. What the answer relies on is, that except some caulking in her upper works, and some supplies of provisions, and some inconsiderable repairs usual on such a voyage, the ship was not "in need of any other reparations, provisions, and other necessaries to render her fit and capable of proceeding thence on her then intended voyage." So that the whole matter of the repairs and supplies is left broadly open upon these general allegations; and, as far as by law they can, or ought to constitute a valid lien upon the ship, as useful, and proper, and reasonable under all the circumstances, for the master to make, they are fairly within the reach of the court.

Upon looking at the general outlines of the evidence, it appears to me, that the ship (which was only upon her second voyage,) was originally well and substantially built, of sound materials, and in a skilful and workmanlike manner. Still it is quite consistent with this general state of facts, that she might have betrayed some infirmity and weakness in some unexpected place. Nor ought this to surprise us, either upon general reasoning, or upon the admitted fact, that ships of this size, and with this peculiar build, that is, with very large round bottoms, exceeding greatly in their actual capacity the registered tonnage, are but of recent origin and structure in our shipyards. Here, for example, is a ship of the registered tonnage of 500 tons, with a capacity safely to transport a cargo of 1300 tons burthen. Under such circumstances, it would not be wonderful, that the degree of strength, which should be required for the keel and the keelson, and the proper positions of the scarfs thereof, relative to the masts, and to each other, should be a matter somewhat of experiment. It seems admitted also, that this class of ships are now built stronger than they were at first; as experience has led the parties interested therein to a more practical knowledge of their actual working at sea.

Now, the great defect supposed to exist in this ship is in the position of the scarfs of the keel and keelson, relative to each other and to the mainmast, and the want of a rider or false keel to increase the strength of this part of the ship. The scarf of the keel, it is said, is under or very near to the mainmast; and to remove this defect was the main object of the repairs, by placing what are called sister keelsons near to the main keelson, and thereby to increase the strength of that vital part of the ship. Upon this subject there is a great conflict of evidence and opinion; and it is somewhat difficult to say on which side there is a decided preponderance. If my judgment rested solely on this point, I should be greatly distressed; for I have not been able to persuade myself that the surveyors were wholly mistaken in their impression, that there was some infirmity of the ship, from the position of the scarfs, and the structure of the keelson, and the stepping of the masts. At least, my mind, after weighing the evidence and the argument, is left in some doubt. But it seems to me, that there are facts in this case, upon which the decision must finally turn, which are either uncontroverted, or, if controverted, are established by evidence entirely satisfactory. In the first place, it is admitted that the ship did leak on her outward passage from Boston to Calcutta, to a considerable extent; that the leak was progressive; and that in rough weather it was greater than in moderate weather; and that when the sea was heavy, and the ship was down on her sides, the leak was so great as to require from one thousand to fourteen hundred and more strokes a day. Now, that this leak, in a ship so new, and under the circumstances of the voyage, was of an unusual nature, and such as, for the success of the voyage, was necessary to be stopped by suitable examinations and repairs at Calcutta, has not been denied, and indeed cannot admit of any reasonable doubt. Indeed, it is positively testified by several shippers on the homeward voyage, some of whom were supercargoes on the outward voyage, that they should not have been willing to ship their goods on the homeward voyage, unless substantial repairs had

been made, so as to stop the leak. The necessity of some repairs is, therefore, as I think, incontrovertible; and the questions, then, on this point, are reduced to these: What repairs were necessary? and, what was the best mode of making them?

The master, on his arrival at Calcutta, did what every prudent master ought to do under the like circumstances. He called a survey of persons skilful in nautical affairs to assist his judgment; and for this purpose selected three masters of American ships, (the only American ships then in the port); a choice certainly, in all respects, unexceptionable, whether it respects their character, or responsibility, or experience, or presumed skill; since they enjoyed the confidence of their respective American owners, and must have every reasonable motive to perform their duty with fidelity and a just regard to the interests of all concerned. The propriety of such a choice, under such circumstances, has not been disputed. But the conduct of the surveyors in making the survey, and the credibility of their statements, have been assailed with a rigor and zeal approaching very nearly to the imputation of their being the victims of the gross frauds or delusions of the master, or of their having wantonly become participators in his meditated wrongs. Now, I must say, that such imputations ought not lightly to be entertained by any court; but ought to be sustained by the most clear and irrefragable proofs. If persons, entrusted with the command of ships in voyages of such high importance and with such valuable cargoes, are, upon mere diversities of judgment and opinions of other witnesses, found wiser than themselves, after the event, and at a distance from the scene, to have their credibility shaken, and their characters assailed, I fear, that hereafter there will be found few of them, who will be willing to undertake the irksome task of a survey; and that it must be left to other humbler and more willing instruments, less confided in by the commercial world, and less entitled to confidence. It is no very pleasing consideration, to perform such a duty at the solicitation of a brother shipmaster and a countryman, and to find ourselves rebuked by reproaches for the want of more honesty of purpose and more skill in judgment.

But it has been urged at the argument, that there are discrepancies in the testimony of the surveyors with themselves, as well as with each other, in different parts of their own depositions. Much minute diligence has been employed in selecting and pointing out and comparing them. Some of them certainly appear to be well founded; but I have not been able to perceive that they amount to enough to overturn the general credibility of their testimony. The circumstances under which the testimony has been taken afford some grounds to account for these discrepancies, independent of any no-tion of an intention of wilful and deliberate perjury. The testimony of the surveyors has been taken at considerable length of time after the occurrences; at distant places; and without the means of refreshing their memories by personal communications with each other, and with others who were on the spot. Some facts must naturally have faded from their minds; and others, again, have left but obscure and broken traces behind them. Of one of the surveyors, the testimony has been taken twice; and another was subjected to a most severe cross-examination of more than one hundred and fifty cross-interrogatories, under circumstances which would lead to some hurry, impatience, and perhaps carelessness of statement. Under such circumstances, it could not be surprising that there should exist some slips, and some discrepancies in the statements. Human infirmity, even with the greatest caution, is not beyond the reach of such occasional lapses.

Now, the court is called upon to reject the whole testimony of the surveyors, and to repudiate the integrity of the survey, upon the discrepancies and diversities of opinion already suggested. I confess, that I have not been able to bring myself to any such conclusion. The surveyors may possibly have erred in their judgments; they may not have examined with the scrutinizing caution of a vigilant owner; they may have made some mistakes in matters of fact. But that they have been either the credulous victims of, or artful participators in, a meditated fraud of the master of the Fortitude, is what I find no warrant for in the evidence. I feel it my duty to say, that I see no reason to impeach either their skill, or their fairness, or their honesty. Their characters as shipmasters, in an independent service, enjoying public confidence, and bound by no known ties to the master of the Fortitude, without any assignable motives for such gross misconduct, forbid me to indulge any belief of this sort, without evidence far more stringent in its bearings, than any in this case. It is not unimportant to add in this connection, that there is a total absence of all evidence on the part of the respondents from other witnesses at Calcutta at the time, to show any misconduct or incompetency on the part of the surveyors, or that their judgment was founded upon false suggestions, or deficient examinations. And yet, if the case was such as the argument at the bar has supposed, it would seem difficult to believe, that there did not exist adequate means at Calcutta to detect the impositions, or to establish a want of judgment in the repairs. On the other hand, the whole testimony, from other witnesses at Calcutta at the time, of the officers, the crew, and the shippers, so far as it goes, leads altogether the other way, and confirms the bona fides of the whole transaction. And then, again, we find, that a Mr. Kidd, (whose premature death has deprived the

parties of his testimony), a most distinguished naval architect, attended the surveyors, and coincided with their opinions both as to the necessity and the mode of the repairs.

We have not the testimony of the master in this case, to give us his own views of the necessity of the repairs, or to vindicate his own good faith in his proceedings. It was taken by the libellants; but upon an objection taken by the respondents at the hearing, it was rejected by the court, on the ground, that the master was incompetent, as a witness, to establish the necessity of the repairs in a suit in rem upon a bottomry bond, where the non-existence of such necessity was the very point of the defence. The ground upon which the court proceeded, in ruling out the deposition, was, that although, as a mere agent, he might not be an incompetent witness in an ordinary suit against the owner personally; yet, in a proceeding in rem upon the bond, the decree in favor of the libellant would necessarily be conclusive, as to the fact of the necessity of the repairs, or at least primâ facie evidence in any suit subsequently brought against the master for his supposed misconduct; since the owner must produce the decree as the substratum of his case. This decision is certainly with much difficulty reconcilable with the common law decisions on the same point, and especially with the case of Evans v. Williams, 7 Term R. 481, note c; Rocher v. Busher, 1 Starkie, 27; and Milward v. Hallett, 2 Caines, 77. I am by no means sure that I was right in this rejection of the deposition. My subsequent researches have not enabled me to feel more confidence in it. And in every case which I have since examined, in the supreme court of the United States, and in the high court of admiralty in England, I find the master's testimony has been admitted without objection, and commented upon as evidence; or else adverted to as proper evidence, when it happened to be absent, even when the point of the necessity of the repairs was directly before the court. See The Virgin, 8 Pet. [33 U. S.] 538; The Jane, 1 Dod. 461; The La Ysabel, Id. 273; The Nelson, 1 Hagg. Adm. 169. I find, too, that Mr. Bell (1 Bell, Comm. B. 3, p. 1, c. 5, § 1, note 456), asserts, that the master is held a competent witness to establish the necessity of the supplies for the ship. If, therefore, this cause should be carried by appeal to the supreme court, I hope, that the libellant will take care to have my judgment upon this point, as one of great practical importance, reviewed.

The rejection of the testimony of the master, under such circumstances, admonishes the court, that it ought not to make any unfavorable inferences against the good faith of the master, unless they are positively required by the most persuasive evidence against him. Primâ facie, and until the contrary is shewn, I must deem him to have acted with good faith, and upright intentions, and reasonable diligence; for he was otherwise guilty of a criminal departure from duty; and the argument has imputed to him meditated fraud, or gross disregard of the interests of the owner.

Now, the surveyors made, as they state, four surveys, three before the repairs, and one after they were completed. They recommended the very repairs to be made, which were made, with entire unanimity; and the estimate of the actual expense of the repairs exceeded that, which was incurred on the occasion. If the leak was in the bottom of the ship, and arose from the infirmity of the keel and keelson, and the scarfs thereof, as the surveyors supposed, I am not aware, that the acts done, and the repairs directed were not reasonable and judicious. Several skilful witnesses have expressed their approbation of them; and at all events they are not proved to be grossly or wantonly unfit for the purpose. The main stress of the argument rests on another ground, that the leak was in the upper works, and could have been removed at a trifling expense. Now, upon this point, whether the leak was in the upper works, or in the bottom, all the surveyors, assisted, as they were, by Kidd, were unanimously of opinion, that it was in the bottom. The weight of evidence, if not the entire evidence, of the persons on board the ship, who have spoken on the point, is the same way. And, indeed, if the question were to rest upon the case, as disclosed by the witnesses at Calcutta at the time, there could be no reasonable doubt of the fact. The difficulty arises from the evidence taken of home witnesses, who testify pointedly to the solidity and sufficiency of the build of the ship; and therefore, by inference, repel the other conclusion, aided by the admitted fact, that in her former voyage, with a large cargo, the ship made no complaint. Here, then, we may be said to have opinion against opinion, and positive affirmative testimony, met by other testimony, amounting to an inferential negative of the former. I do not stop to compare the various portions of the evidence with each other; for in whatever particulars they may agree, or differ, the conclusion which, upon the whole, my mind has arrived at, is, that it is not clearly made out, that the surveyors were under a mistake, as to the cause of the leak, or that the repairs were, under the circumstances, injudicious or improper. The case, made out upon the survey and proceedings at Calcutta, appears to me one, in which primâ facie the repairs ought to have been made by the master. The onus under such circumstances is upon the respondents to displace that case; and I am not able to say that it has been done. The most that can be said is, that some doubt has been thrown upon it.

But, assuming that the surveyors have acted upon a mistake (for in my judgment

there is not the slightest proof of fraud), and that all the Calcutta witnesses are equally under a mistake, as to the cause of the leak, and that the mistake, though then undiscovered and undiscoverable by the exercise of ordinary diligence, is now demonstrable upon a mere critical review of evidence then unattainable, but now within the reach of the parties, from the shipwrights who constructed the ship, and others, who are of great skill and experience; I say, assuming this to be the present position of the case, what is now to be the effect? Is the master, acting upon the best advice he could obtain at the time, and with an exercise of reasonable diligence, to be now treated as unworthy of confidence, and his acts utterly void, to bind his owner? What, under such circumstances, was the master to do? The shippers here told us, that they would not have shipped their goods, if substantial repairs had not been made. Was the master to give up all the interests of the voyage upon possible doubts, thereafter to be entertained, as to the repairs? It is true, that the ship was not then in the employment of the owners, but of the charterers for the voyage. But that makes no difference; for whatever it was his duty to do, if the owners had been interested in the freight for the voyage, it was equally his duty to do for the charterers. It seems to me that the master was reduced to this dilemma, either to give up the objects of the voyage, and return with little or no freight, or to go on, and make such repairs, as upon his own judgment, aided by the advice of competent surveyors, would meet the apparent exigencies of the occasion. If he has acted with reasonable discretion and diligence, it seems to me, that under such circumstances his acts ought to bind the owner, or there would be an end to all safety in commercial enterprises.

Then, again, what is the predicament of the lender under the like circumstances? No one pretends, that he is bound to superintend the repairs, or to see to the actual application of the money advanced therefor; or minutely to ascertain the exact amount required for the purpose. All the authorities, ancient and modern, speaking on the point, inculcate a very different doctrine as to his duty and responsibility. He is to see, that an apparent case of necessity for repairs is made out; and he is to take care, that he does not knowingly advance more money than what may be fairly deemed fit for the occasion. But having done this, and acted with good faith, he is protected by the law to the extent of his contract. Nothing more would seem necessary, than to refer to the very clear statements of Emerigon on this subject. Emer. Traité à la Grosse, tom. 2, c. 4, §§ 5, 8. If, then, there has been a mistake made, as to the mode or the extent of the repairs; but it has been unintentional, and after reasonable examination; and there was a leak necessary to be stopped, what has the lender to do with the matter? He is not supposed by the law to have any skill, or to exercise any particular judgment as to the mode of repairs. He may be utterly incompetent to decide upon such subjects; and he may be driven to rest his conduct upon the skill and judgment of others of reasonable nautical experience and practical knowledge. "Non oportet" (says the civil law), "creditorem ad hoc adstringi, ut ipse reficiendae navis curam suscipiat, et negotium domini gerat" (Dig. lib. 14, tit. 1, 1. 7); and such is the language of all maritime jurists. For the same reason, the lender has no obligation on him to search out and ascertain the true cause of the loss, or the damage which requires the repairs. It belongs not to him rerum cognoscere causas; it is sufficient, that the necessity of the repairs is made apparent, and that he has made due inquiry into that fact. But, then, it is said, that the lender in this case made no inquiries, and exerted no diligence. But no proof is given to that effect. We find him advancing his money, and taking a bottomry bond from the master for the amount, which bond recites the ship's necessities; and it is to be presumed that he first made all due and reasonable inquiries on the subject which the occasion required. If the state of facts was such as justified the repairs, no diligence was necessary, except perhaps to ascertain whether the master had any other funds or credit, which is not pretended in this case; or at least was not made out at the argument. If there was no real necessity, and yet the lender could not by any diligence have ascertained the fact, the law would not force him to fruitless inquiries. If there was an apparent necessity, and farther inquiries would not have changed that predicament of the case, then it would be sufficient for him to act upon that apparent necessity. But it is hardly credible, that he should not have been informed of the survey, and of the opinion of the surveyors, and of the nature and extent of the repairs, for which he was required to advance his money. Indeed the bottomry bond contains a recital that, "a regular and careful survey had been made on the ship, and then it was found, &c. &c." What further duty of diligence was required of him? How is it shewn, that upon further inquiries his judgment would have been enlightened on the subject? Not a single Calcutta witness has been examined to disprove the state of things certified by the surveyors. I must presume, therefore, that none would be found, who would disprove it.

Having said thus much upon the general principles applicable to the case, and the material facts, so far as they bear upon the rights and duties of the bottomry lender, the subject is, with me at least, exhausted.

I have not thought it necessary to spread upon this opinion a minute survey of the evidence for, or against particular conclusions or presumptions. I have limited myself to such results as seemed to me to dispose of the whole merits of the case, so far, at least, as my judgment is concerned. In a case of this sort, I have not been able to persuade myself, that any comparison and balancing of minor facts, or supposed contradictions, though eminently fit and proper at the argument, would be of any service in the final judgment, which, after all, must rest upon a broad and general survey of the material facts necessary to sustain the bond. My judgment is, that the bottomry bond is well sustained; and that a decree ought to be rendered affirming its validity, and decreeing to the libellant the amount thereof with interest and costs.