## THE AMELIE.

1. In order to justify the sale, by the master of his vessel, in a distant port, in the course of her voyage, good faith in making the sale, and a necessity for it, must both concur; and the purchaser, in order to have a valid title, must show their concurrence. The question is not whether it is expedient to break up a voyage and sell the ship, but whether there was a legal necessity to do it. And this necessity is a question of fact, to be determined in each case by the circumstances in which the master is placed, and the perils to which the property is exposed.
2. Where the sale of a vessel owned in Amsterdam, was made at Port au Prince, after a careful survey by five persons—one, the British Lloyd's agent; another, the agent of the American underwriters; and the remaining three, captains of vessels temporarily detained in port—the whole appointed by, and acting under the authority of the consul of the country where the vessel was owned—which five surveyors unanimously agreed that the vessel was not worth repairing, and advised a sale of her, this was held to pass a valid title—no evidence being before the master that the report was erroneous; and this, although the master did not consult his owners at Amsterdam, and though the vessel afterwards at a great expense—greater, as the court assumed, than her new value—was repaired, and went to her original port of destination, and thence abroad with another cargo.
3. A justifiable sale divests all liens.

4. A bill of sale from the master is not required to pass title. The sale, itself, followed by possession taken, does this.

·APPEAL from the Circuit Court for the District of Massachusetts.

Fitz, of Boston, was owner of goods to the value of $8300, shipped at Surinam on board the Amelie, a Dutch vessel owned in Amsterdam, and to be delivered to him in Boston. The vessel when she left her port was apparently seaworthy and well provided, but having been struck with lightning in the course of her voyage, and encountering perils of the sea, was compelled to seek some harbor, and with difficulty she made Port au Prince. She was here surveyed by two masters of vessels appointed by the Dutch consul there. These examined the outside of the vessel and found damage upon it, which they reported. In an attempt to repair this, and after the outlay of $800 or $1000, further damage, on removing part of the cargo, was discovered. On this, a second survey was held. Upon this new survey there were two masters of vessels, the head of the shipyard at Port au Prince, the agent of the New York underwriters, and Lloyd's agent. They reported the outside of the vessel injured in the same manner that the first survey had reported, and reported other considerable injuries besides (which they specified), and recommended that new knees and planks should be put in, with other repairs, which they estimated would cost 10,000 Haytien dollars, and take from twenty-five to thirty days. They said that permanent repairs could not be made at Port au Prince, but that the repairs recommended would be sufficient to take the vessel to Boston.

In making these temporary repairs, one of the sides of the vessel was uncovered, and the timbers of the vessel, which were then first made visible, were found to be broken on the larboard side. The damage was of so serious a character that a third survey was ordered by the Dutch consul. This third survey had upon it the agent of the New York underwriters, Lloyd's agent, who were also on the second survey, and three masters of vessels. These last-appointed sur-

veyors made a report, stating at length the damage which they were able to find; their belief that additional damage would be found when the vessel was further uncovered; what the vessel would require; that there were no docks, nor competent ship-carpenters, nor requisite timber or materials at Port au Prince; and consequently that they were compelled to come to the conclusion that it would not be possible to make the necessary repairs in that port in a proper manner. They further reported that if materials could be obtained, the time taken would be not less than four months, and would cost more than the vessel would be worth after the repairs were made. The surveyors, for this reason, advised that the voyage should be broken up, the vessel sold for the interest of *all concerned*, and the cargo transshipped to Boston.

The vessel was accordingly put up at public auction, and, after full notice, knocked down for $407 in gold, to one Riviere, who took possession.

The surveys seemed to have been carefully made, the second one having occupied two hours in the examination, and the third, or last, half a day. The reports were full and particular.

After the purchase of the vessel by Riviere, he repaired her, at a cost in gold of $1695.31, and sent her to Boston.

At the time that the master sold the vessel at Port au Prince, he sold also a part of the cargo, the property, as already mentioned, of Fitz, for the proceeds of which ($2441) he never accounted.

On the arrival of the vessel at Boston, Fitz libelled her; asserting a lien and claiming damages for the non-delivery of the cargo. The vessel having been sold by order of court, the purchaser made repairs to the extent of about $143, took off her copper, which he sold for $1157, and sent her to England with a full cargo. She was forty days on the passage; had a good deal of bad weather; showed no symptoms of weakness, and appeared stanch and strong.

On a claim made by Fitz to the proceeds of the vessel in the Registry, $2138, the District Court dismissed the claim;

and this decree was affirmed in the Circuit Court. The matter was now here for review.

*Messrs. B. R. Curtis and F. C. Loring, for the appellants:*

I. The sale of the vessel was not justifiable, and it passed no title to Riviere.

1. The vessel was capable of being repaired, as is shown by the fact that she was repaired, and this at a less cost than her value; that she took a cargo to Boston, and afterwards to England, and that she was found to be stanch, strong, and seaworthy. The master, too, who sold a part of the cargo, had funds to pay for repairs and had not attempted a loan on bottomry. Now, if there is anything settled by the law, it is, that under such circumstances a master is under no legal necessity, and being under no such necessity, has no power to sell.*

2. Where there is a *possibility* of communicating with the owners without destructive consequences, it is the first duty of the master so to communicate and await his owners' instructions.† It is not suggested here, by the other side, nor does the case indicate, that the vessel was so situated as to be in immediate danger from any cause. She did not leak. She was in a safe harbor, her copper was heavy and in order, and in these days of steam navigation the master could have written to his owners in Amsterdam, and received their instructions probably in less than thirty days. According to the authorities he was bound to do so, and the sale was not of necessity. The burden is on the purchaser to show that there was no time for communication without danger of loss, and he does not attempt to do so.

3. If the master does not act in perfect good faith, the sale is void. Whether the master did so act, is a question of fact, and the burden is on the purchaser to prove that he

---

* The Sarah Ann, 13 Peters, 401; Freeman *v.* E. & I. Co., 5 Barnewall & Alderson, 617; The Fanny and Elmira, Edwards, 117; The Bonita, Lushington, 261.

† The Bonita, 1 Lushington, 253; Hall *v.* Franklin Insurance Co., 9 Pickering, 478.

did.* "While the power," says Grier, J.,† "is not denied, its exercise should be closely scrutinized." In this case fraud is to be inferred from the master's conduct. It does not appear that he had no funds of his owners, or could not procure them on their credit, or raise money on bottomry, before he proceeded to sell cargo. The temporary repairs recommended by the first survey would have cost $800, and that was all that he required at first, yet he sold to more than double the amount. He never advised the owners of the cargo of its sale, nor, so far as appears, the owners of the vessel. In fact, he stole the larger part of the proceeds of the cargo. The presumption is, in fine, every way against him, and the burden on the purchaser to remove it, and he has not attempted it.

It is not necessary to impute bad faith to the purchaser, the present claimant; yet it must not be overlooked, that he had means of knowing that the master was not acting rightly. He consequently bought at his peril, and if the owner, or one having his right, chooses to dispute his title, he must yield.‡

II. But even if the sale was proper under the circumstances, we insist that the purchaser Riviere, took the title subject to all existing liens.

Vessels, unlike other chattels, are subject to various maritime liens, necessarily secret, not requiring possession, and not obvious to strangers, yet protected from reasons of policy in all maritime states. Such are the liens created by bottomry; for repairs in a foreign port on the credit of the ship; of the owner of the cargo for its safe transportation and delivery; of the salvor; of the sailor for wages; of material men; the lien caused by a tortious collision; and others, all recognized by law, essential to the interest of commerce, constantly enforced by courts of admiralty, the existence of which are never apparent, and not always known to the master and owners, and therefore not to be

---

* The Sarah Ann, 13 Peters, 401.
† Post v. Jones, 19 Howard, 158.
‡ The Bonita, Lushington, 264.

learned by inquiry; valuable rights. Does the master of the vessel by a sale, destroy them, seamen's wages and all?

There is no analogy between a decree of a court of admiralty and the act of a master in making a sale. In the one case notice is given to all the world: any person interested has the right to appear, and in case of sale the proceeds are paid into court for the benefit of all concerned. In the other, no notice is given to any one, unless by the advertisement of a sale at auction; no one has the right or power to interfere, and the proceeds are paid to the master, who, as in this case, may appropriate them to his own use.

It is obvious what frauds the establishment of such a rule would encourage, and what temptations to make fraudulent sales would be opened. The policy of the law is to discourage sales by the master, but this would afford every inducement to make them.

Authorities seem, however, to render argument useless, for they settle the point, that a maritime lien is not displaced by a sale.

In *The Europa*,* it was held that a lien for damage by collision was not defeated by a sale to a *bonâ fide* purchaser without notice. A similar view has been taken in our own country as to the lien of a shipper for damages.†

In *The Catharine*,‡ a sale by the *master*, in a port of distress, was held not to devest lien of a lender on bottomry. Dr. Lushington says:

" I think that a British vessel coming into a foreign port cannot be sold by the master, so as to . . . . extinguish all mortgage claims and liens on bottomry or wages, even in a case of necessity. It is the duty of foreign purchasers to open their eyes and to take care what kind of a bargain they make, that they guard themselves against liens which adhere to the ship."

The authority of the master even in regard to the owners

---

* 8 Law Times, 368.

† The Rebecca, Ware, 212. See also on the subject generally, The Eliza Jane, Sprague, 152, and The Nymph, Swabey, 87.

‡ 1 English Law and Equity, 679.

is watched with jealousy. How much more ought it to be in regard to those who have not appointed him, but who as lenders may be concerned more than owners themselves! Is it said that the master is acting for all concerned? Concerned in what? In whether, of course, there shall be a sale. If their liens are devested, mariners, lenders on bottomry and other lien creditors are concerned. And if the master is acting for them, the liens are protected. If he is not acting for them, he is not acting for all concerned; and unless the law protects them, they are without any protection at the moment when most needing it. Will it be argued that the proceeds of the vessel are as good as the vessel, and take its place? This is not so; for a fraudulent captain easily disposes of the proceeds of the ship, as he has done here with those of the cargo sold. The vessel, whether in a good state or bad, is a better security.

III. The purchaser never acquired a valid legal title. The vessel was struck off to him at auction, and he afterwards took possession; but it is nowhere alleged or proved that the master executed a bill of sale in his own name, or that of the owner. By the general maritime law a bill of sale is necessary to transfer the title.* It is for him to sustain his claim and title.

*Mr. C. W. Loring, contra, argued:*

I. That a necessity has always been held to exist when a vessel is injured by perils of the sea to such an extent that the cost of repairs would be more than her value when repaired and arrived at her port of destination, and

That if, in the opinion of those best competent to judge, the vessel so injured is not worth repairing, and the master acting in good faith, and after careful investigation and conference, upon that opinion sells his vessel, he is justified in so doing, though it afterwards turns out that the opinion

---

* The Sisters, 5 Robinson, 138 ; The Segredo, 1 Spinks, 46, per Dr. Lushington ; Atkinson v. Malling, 2 Term, 466 ; Ex parte Halkett, 19 Vesey, 473 ; 3 Kent's Commentaries, 186.

was incorrect, and the vessel could have been repaired at less cost and less than her value when repaired.

In all the cases cited below,* the vessels were in port when sold; they were sold by the masters without consulting the owners, and they were afterwards repaired, and all but one came to England, where they belonged. Yet the sales were all confirmed by reason of necessity.

But supposing that the vessel could have been repaired and forwarded, to the advantage of the owners of the cargo. It is submitted that this is one of those cases where the circumstances justify the master, though he were mistaken. Lloyd's agents, who represent the English underwriters, the agent of the New York underwriters (persons appointed for the express purpose of having vessels repaired when it is best to repair them), three masters of vessels, one of them who has given his deposition, and all appointed by the Dutch consul,-say, after examining the vessel for a whole forenoon, and giving their reasons for it, " that they are obliged to come to the conclusion that it is not possible to make the necessary repairs in this port in a proper manner."

In the face of this advice, no master would have dared to repair the vessel. The underwriters' agents are selected for the sole purpose of attending to these matters. From their knowledge of vessels and of costs of repairs, they are the best advisers that can be obtained. In *The Bonita*,† Dr. Lushington did not confirm a sale, principally because Lloyd's agent advised repairing, and warned the master against selling. In *Gordon* v. *Massachusetts Fire and Marine Insurance Co.*,‡ it is said the only alternative left for a master is to follow advice of the surveyors.

II. *Are the liens discharged?* A lawful sale of a vessel, of necessity, by the master, is for all concerned, and passes a clean title to the purchaser: the proceeds in the master's hands take the place of the vessel.

1. Upon examining the authorities, we shall find that it

---

* The Glasgow, 1 Swabey, 150; The Australia, Id. 484; The Margaret Mitchell, Id. 382.

† 1 Lushington, 263.　　　　　　　‡ 2 Pickering, 264.

has always been considered that *the sale was for all concerned.*\* Grier, J., for this court, so speaks of it in *Post* v. *Jones.*†

2. There are several cases in which liens have been held to attach to the proceeds of a vessel.‡

In the case of *The Catharine*, cited on the other side, and where Dr. Lushington says that a sale by master does not discharge liens, he also says: "I am not satisfied in this case that there was a necessity for a sale." It was therefore a mere dictum where he says, that in a case of necessity, he should doubt whether, under such a sale, a ship could be sold free from lien.

III. No bill of sale was necessary, and *haud constat* but that one was given.

Mr. Justice DAVIS delivered the opinion of the court.

The principle of maritime law which governs this controversy is too well settled for dispute. Although the power of the master to sell his ship in any case, without the express authority of the owner, was formerly denied, yet it is now the received doctrine of the courts in this country as well as in England, that the master has the right to sell in case of actual necessity.

We are not called upon to discuss the reasons for the rule, nor to cite authorities in its support, because it has repeatedly received the sanction of this court.§

From the very nature of the case (the court say), there must be this implied authority of the master to sell. The injury to the vessel may be so great and the necessity so urgent as to justify a sale, and under such circumstances, the master becomes the agent of all concerned, and is re-

---

\* New England Ins. Co. *v.* The Sarah Ann, 13 Peters, 402; Patapsco Ins. Co. *v.* Southgate, 5 Id. 620, 621; Gordon *v.* Massachusetts Fire and Marine Ins. Co., 2 Pickering, 262–4; Hunter *v.* Parker, 7 Meeson & Welsby, 342; Milles *v.* Fletcher, 1 Douglass, 234.

† 19 Howard, 158.

‡ Sheppard *v.* Taylor, 5 Peters, 675; Willard *v.* Dorr, 3 Mason, 168; Brown et al. *v.* Lull, 2 Sumner, 443.

§ The Patapsco Ins. Co. *v.* Southgate, 5 Peters, 620; The Sarah Ann, 13 Id. 400; Post et al. *v.* Jones et al., 19 Howard, 157.

quired to act for their benefit. The sale of a ship becomes a necessity within the meaning of the commercial law, when nothing better can be done for the owner, or those concerned in the adventure. If the master, on his part, has an honest purpose to serve those who are interested in ship and cargo, and can clearly prove that the condition of his vessel required him to sell, then he is justified. As the power is liable to abuse, it must be exercised in the most perfect good faith, and it is the duty of courts and juries to watch with great care the conduct of the master. In order to justify the sale, good faith in making it and the necessity for it must both concur, and the purchaser, to protect his title, must be able to show their concurrence. The question is not whether it is expedient to break up a voyage and sell the ship, but whether there was a legal necessity to do it. If this can be shown, the master is justified; otherwise not. And this necessity is a question of fact, to be determined in each case by the circumstances in which the master is placed, and the perils to which the property is exposed.

If the master can within a reasonable time consult the owners, he is required to do it, because they should have an opportunity to decide whether in their judgment a sale is necessary. And he should never sell, when in port with a disabled ship, without first calling to his aid disinterested persons of skill and experience, who are competent to advise, after a full survey of the vessel and her injuries, whether she had better be repaired or sold. And although his authority to sell does not depend on their recommendation, yet, if they advise a sale, and he acts on their advice, he is in a condition to furnish the court or jury reviewing the proceedings, strong evidence in justification of his conduct.

The facts of this case bring it within these well-settled principles of maritime law, and clearly show that the master was justified in terminating his voyage and selling his ship. When the voyage began, the ship was seaworthy and well provided, but after she had been at sea a short time, she became disabled during a violent storm, and with great dif-

ficulty was taken into the harbor of Port au Prince. The master at once entered his protest before the Dutch consul general (the ship being owned in Amsterdam), who caused three surveys to be made of the condition of the vessel. No action was taken on the first survey, but the result of the second was to incur an expense of one thousand Spanish dollars in partial repairs, decided by *it* to be practicable, and recommended, in order that the ship should be put in a proper condition to proceed on her voyage to Boston. In making these partial repairs, one of the sides of the vessel was uncovered, disclosing additional damages, of a serious character, not previously ascertainable, which caused the consul general to order a third survey. This third and final survey was thorough and complete. The men who made it were captains of vessels, temporarily detained in port, and the agents of American and English underwriters. No persons could be more competent to advise, or from the nature of their employment, better acquainted with the structure of vessels, and the cost of repairing them.

Their report is full and explicit. After the advice given in it, the master, who was bound to look to the interest of all parties concerned in the adventure, had no alternative but to sell. In the face of it, had he proceeded to repair his vessel, he would have been culpable. Being in a distant port, with a disabled vessel, seeking a solution of the difficulties surrounding him ; at a great distance from his owners; with no direct means of communicating with them; and having good reason to believe the copper of his vessel was displaced, and that worms would work her destruction, what course so proper to pursue, as to obtain the advice " of that body of men, who by the usage of trade have been immemorially resorted to on such occasions ?"* No prudent man, under the circumstances, would have failed to follow their advice, and the state of things, as proved in this case, imposed on the master a moral necessity to sell his vessel and reship his cargo.

---

* Gordon *v.* Mass. Ins. Co., 2 Pickering, 264.

But it is said, the fact that the vessel was repaired by the purchaser and sent to Boston, disproves this necessity. Not so. It may tend to prove the surveyors were mistaken, but does not affect the question of the duty of the master to follow their advice, when given in such strong terms, and with no evidence before him that it was erroneous. But in fact, the surveyors did not err in their conclusion that the vessel was not worth the cost of repairs, as the amount in the registry of the court for which the vessel was sold in Boston, will fail to reimburse the claimant the money expended by him, in purchasing and repairing her.

It is insisted, even if the circumstances were such as to justify the sale and pass a valid title to the vendee, he, nevertheless, took the title subject to all existing liens. If this position were sound, it would materially affect the interests of commerce; for, as exigencies are constantly arising, requiring the master to terminate the voyage as hopeless, and sell the property in his charge for the highest price he can get, would any man of common prudence buy a ship sold under such circumstances, if he took the title encumbered with secret liens, about which, in the great majority of cases, he could not have the opportunity of learning anything? The ground on which the right to sell rests is, that in case of disaster, the master, from necessity, becomes the agent of all the parties in interest, and is bound to do the best for them that he can, in the condition in which he is placed, and, therefore, has the power to dispose of the property for their benefit. When nothing better can be done for the interest of those concerned in the property than to sell, it is a case of necessity, and as the master acts for all, and is the agent of all, he sells as well for the lien-holder as the owner. The very object of the sale, according to the uniform current of the decisions, is to save something for the benefit of all concerned, and if this is so, the proceeds of the ship, necessarily, by operation of law, stand in place of the ship. If the ship can only be sold in case of necessity, where the good faith of the master is unquestioned, and if it

be the purpose of the sale to save something for the parties in interest, does not sound policy require a clean title to be given the purchaser in order that the property may bring its full value?· If the sale is impeached, the law imposes on the purchaser the burden of showing the necessity for it, and this he is in a position to do, because the facts which constitute the legal necessity are within his reach; but he cannot know, nor be expected to know, in the exercise of reasonable diligence, the nature and extent of the liens that have attached to the vessel. Without pursuing the subject further, we are clearly of the opinion, when the ship is lawfully sold, the purchaser takes an absolute title devested of all liens, and that the liens are transferred to the proceeds of the ship, which, in the sense of the admiralty law, becomes the substitute for the ship.

The title of Riviere, the claimant, was questioned at the bar, because he did not prove the master executed to him a bill of sale of the vessel. We do not clearly see how this question is presented in the record, for there is no proof, either way, on the subject, but if it is, it is easily answered. A bill of sale was not necessary to transfer the title to the vessel. After it was sold and delivered, the property was changed, and no written instrument was needed to give effect to the title. The rule of the common law on this subject has not been altered by statute. The law of the United States, which requires the register to be inserted in the bill of sale on every transfer of a vessel, applies only to the character and privileges of the vessel as an American ship. It has no application to this vessel and this case.*

DECREE AFFIRMED.

---

* Wendover v. Hogeboom, 7 Johnson, 308; Sharp v. United States Insurance Co., 14 Id. 201; Weston v. Penniman, 1 Mason, 306.