## THE TRENTON.

*(District Court, E. D. Michigan.* November 29, 1880.)

1. ADMIRALTY—SALE—LIENS.—By the law of most, if not all, civilized nations, the sale of a vessel by proceedings *in rem*, in a court of competent jurisdiction, extinguishes all liens upon her, and vests a clear and indefeasible title in the purchaser.

2. SAME—SAME—SAME.—Hence, where an American vessel was sold by the maritime court of Ontario, the sale was held to discharge a lien for necessaries furnished in Cleveland, Ohio, notwithstanding the court had declined to enforce such lien against the vessel for the want of jurisdiction.

3. SAME—SAME—SAME.—In such cases the lienholder is remitted to his remedy against the proceeds of sale, and it seems that his claim will be allowed wherever a lien exists by the law of the place where the contract is made.

In Admiralty.

This was a libel for supplies and materials furnished at Cleveland, the home port of the vessel, in 1876, for which a lien was claimed under the law of the state of Ohio. The present owner of the schooner, appearing as claimant, pleaded in substance that in July, 1878, the libellants caused the vessel to be seized at Toronto, Ontario, by virtue of a warrant issued by the maritime court of Ontario, upon a petition filed by the libellants for the same cause of action for which their libel was filed in this court; that in August, 1878, one Michael Gallagher intervened with a claim for wages as watchman and ship-keeper from December 1, 1877, to June 27, 1878; that about the same time one William McAllister also intervened with a claim for wages as mate from April 4

to May 4, 1877, to the amount of $52.50; that the two last-mentioned claims were consolidated, and on September 25, 1878, the vessel was condemned and ordered sold to satisfy these claims; that upon such sale she was purchased by the claimant for $1,000, and she has since been registered at the custom-house in Toronto; that notice of the pendency of these proceedings, and of the sale, was given by publication, pursuant to the practice of the court, and by the arrest und detention of the vessel; that the maritime court of Ontario had jurisdiction of these causes and authority to direct the sale, and that claimant became the owner of the vessel, discharged of all liens.

It appeared, from the proceedings in the Canadian case, that a demurrer was interposed to libellants' petition, upon the ground that the maritime court had no jurisdiction to enforce a claim for necessaries supplied to an American vessel in a port in the United States. This demurrer was sustained by the court, and libellants' petition dismissed. The vessel was sold, as above stated, by virtue of a decree rendered upon the consolidated claims of Gallagher and Mc-Allister. The question in this case was whether this sale was sufficient to divest the libellants of their claim for necessaries.

*Moore & Canfield*, for libellants.

*Wisner & Speed*, for claimant.

BROWN, D. J. The maritime court of Ontario was created by an act of parliament of the dominion of Canada, approved April 28, 1877, the object of which was "to establish a court of maritime jurisdiction in the province of Ontario." The first section vested in the court, in very brief language, "such jurisdiction as is exercised by any existing British vice-admiralty court." To ascertain what jurisdiction is exercised by the vice-admiralty courts of Great Britain, we are referred to an act of the imperial parliament known as "the vice-admiralty court's act, 1863," which is made applicable to all existing as well as to future vice-admiralty courts. The tenth section of this act declares that these courts shall have cognizance

of what are generally known as maritime cases, viz.: Seamen's and master's wages, pilotage, salvage, towage, damage, bottomry bonds, payments of mortgages from the proceeds of sale, possessory suits, and, among others, (subdivision 10,) "claims for necessaries supplied in the possession in which the court is established, to any ship of which no owner or part owner is domiciled within the possession at the time of the necessaries being supplied."

In considering the effect of this sale, I must assume that the dominion parliament had the requisite authority to establish this court, and that it possesses the powers and jurisdiction which the act purports to vest in it. While not strictly a vice-admiralty court, (the judges of which hold their commissions directly from the crown,) its jurisdiction is nearly if not quite identical with those courts, and we are bound to give its proceedings such faith and credit as is given to them.

That the sale of a vessel, made pursuant to the decree of a foreign court of admiralty, will be held valid in every other country, and will vest a clear and indefeasible title in the purchaser, is entirely settled, both in England and America. Story on Conflict of Laws, § 592; *Williams* v. *Armroyd*, 7 Cr. 423; *The Tremont*, 1 W. Rob. 163; *The Mary*, 9 Cr. 126; *The Amelie*, 6 Wall. 18; *The Granite State*, 1 Sprague, 277. In the case of *The Helena*, 4 Rob. Adm. 4, this doctrine was carried so far as to sustain a sale made after a capture by pirates. See, also, *Grant* v. *McLaughlin*, 4 John. 34.

These cases fully establish the doctrine stated by Mr. Justice Story, (Conflict of Laws, § 592,) that "whatever the court settles as to the right or title, or whatever disposition it makes of the property by sale, revendication, transfer, or other act, will be held valid in every other country where the same question comes directly or indirectly in judgment before any other foreign tribunal. This is very familiarly known in the cases of proceedings *in rem* in foreign courts of admiralty, whether they are causes of prize, or of bottomry, or of salvage, or of forfeiture, or of any of the like nature over which courts have a rightful jurisdiction, founded upon the actual, rightful, or

constructive possession of the subject-matter." This is not the law of England and America alone. The commercial code of France contains similar provisions regarding the judicial sale of ships.

Article 193: "The liens of creditors shall be extinguished, independently of the general methods of extinguishing obligations, by a judicial sale made according to the forms established by the following title, or when, after a voluntary sale, the ship shall have made a voyage at sea under the name and at the risk of the purchaser, and without opposition on the part of the creditors of the vendor."

In commenting upon this article, Dufour observes, (2 Droit Maritime, 47:) "Moreover, the sale upon seizure has always had the effect, in our law, of purging the encumbrances with which the property was charged." "The decree clears all liens," said Loysel. "We perceive the reason of this. These kinds of sales are made notoriously and publicly. The creditors are perfectly advised of what is passing. It is for them to take precautions to assure their payment from the price of the ship; but if they persist in remaining unknown their negligence ought not to prejudice the purchaser. To these general reasons we ought to add another peculiar to the maritime law. He who buys at a judicial sale must pay his price upon the spot. He is not bound to wait until the creditors are made known to pay into their hands. He ought, then, to be protected against their claims. Otherwise the judicial sale, instead of offering security which attracts buyers, would be only a snare from which they would eagerly escape. For these reasons, according to our article, the purchaser at a judicial sale receives the vessel free and clear of all encumbrances." Page 53. "Moreover, it would not follow that the creditors are entirely disarmed by this result. On the one hand their debt, in effect, subsists; and, on the other, nothing is easier than to transfer the entire amount, with the lien which it draws after it, to the price of the ship."

Article 766 of the German Mercantile Code expressly provides that the lien of ships' creditors upon the vessel becomes

void: (1)' "By a compulsory sale of the vessel in a home port the purchase money takes the place of the ship, as regards the ship's creditors. The ship's creditors must be publicly summoned to protect their rights. In other respects the provisions regulating the proceedings for a sale are reserved to the laws of the various countries." The 600th article of the Spanish Code is equally explicit: "If the sale takes place at public auction and with the intervention of judicial authority, according to the formulas prescribed by article 608, every responsibility of the ship in favor of its creditors is extinguished from the moment in which the written evidence of sale is agreed to." Similar provisions are found in article 1398 of the Portuguese, article 193 of the Belgian, article 290 of the Italian, article 840 of the Chilian, and article 477 of the Brazilian Code. In short, the doctrine that the sale of a vessel by a court of competent jurisdiction discharges her from liens of every description, is the law of the civilized world.

Such sales, however, may be impeached by the owner or other person interested by showing (1) that the court or officer making the sale had no jurisdiction of the subject-matter by actual seizure and custody of the thing sold. *Rose* v. *Himely*, 4 Cranch, 241; *Bradstreet* v. *The Neptune Ins. Co.* 3 Sumn. 601; *The Mary*, 9 Cranch, 126; *Woodruff* v. *Taylor*, 20 Vt. 65; *Daily* v. *Doe*, 3 FED. REP. 903. Whether it be not also essential that there should have been proper judicial proceedings upon which to found the decree, and personal or public notice of the pendency of such proceedings, it is unnecessary here to determine, since it appears that sworn petitions were filed, and notice of the pendency of the proceedings given through the newspapers, pursuant to the practice of the maritime court. (2) That the sale was made by a fraudulent collusion, to which the purchaser at such sale was a party. *Parkhurst* v. *Sumner*, 23 Vt. 538; *Annett* v. *Terry*, 35 N. Y. 256; *Castrique* v. *Imrie*, L. R. 4 H. of L. 427. (3) That the sale was contrary to natural justice. *The Flad Dyen*, 1 C. Rob. 135; *Castrique* v. *Imrie*. In case of sale by a master, the court will inquire into the circumstances and see whether

it was necessary and for the interest of all concerned; but the effect of such sale to discharge liens is the same. *The Amelie,* 6 Wall. 18.

In the case under consideration none of these objections are taken to the validity of the sale, but it is insisted that it cannot be held to have discharged the vessel of liens which the court making the sale had no jurisdiction to enforce. I have found no case, except possibly that of *The Angelique,* (17 Law Rep. 104, since expressly overruled,) which lends countenance to this proposition. Upon principle, it seems to me wholly untenable. It is true the vessel was originally condemned, in part at least, upon a claim for ship-keepers' fees, which would not in this country be considered to import a maritime lien. *The Thomas Scattergood,* Gilpin, 1; *The Havana,* 1 Sprague, 402; *The Island City,* 1 Low. 375; *The Sarah Jane,* 2 Am. Law Rev. 450; *Gurney* v. *Crockett,* Abb. Ad. 493. But this was a question exclusively for the consideration of the maritime court under the laws of Canada, and the presumption is conclusive that the facts necessary to give that court jurisdiction existed. *Hudson* v. *Guestier,* 6 Cr. 281; *Comstock* v. *Crawford,* 3 Wall. 396. To say that the judicial sale of a vessel frees her only from such liens as the court making the sale had jurisdiction to enforce by original process, is a practical denial of the principle that such a sale vests a clear title in the purchaser. This would make the validity of the sale depend, not upon the power of the court to condemn and sell, but upon its authority to assume jurisdiction of all claims which, by the law of another country, might be liens upon her. There are probably no two countries in which the jurisdiction of the admiralty courts is identically the same. That of our own courts does not extend to all cases which would fall within such jurisdiction according to the civil law, and the practices and usages of continental Europe. By the codes of most civilized nations the cost of construction, the wages of ship-keepers, the rent of warehouses for the storage of her tackle and apparel, money lent to the captain for the use of the vessel, are all ranked among privileged debts. In

England the court of admiralty is vested with jurisdiction, not only of ordinary collisions, but of damages done by a ship to wharves, breakwaters, and other fixtures annexed to the soil; while in this country it is limited to floating structures. In England a master has a remedy against the ship and freight for wages. In the United States he is confined to a proceeding *in personam*. By the law of continental Europe a lien arises for necessaries furnished in a home port, while in this country there is none unless created by a state statute, and none in England if an owner is domiciled within the kingdom. We also recognize liens for general average, wharfage, stevedores' wages, and premiums of insurance, none of which are within the jurisdiction of the admiralty division of the high court of justice. We also admit claims for damage to cargoes, while the English court can only proceed against the vessel where the cargo is brought into England or Wales, and no owner is domiciled therein. It may be added that the English admiralty has jurisdiction of accounts between part owners, and may decree the sale of a share or shares in the ship, while we can only take cognizance of such disputes incidentally to the distribution of the proceeds.

Now, if the theory of the libellant be correct, a judicial sale of a vessel in one country would free her from none of the liens which the courts of that country were unable to enforce. A sale under such circumstances would be utterly destructive of the interests of owners and a complete sacrifice of the vessel. No one could possibly know the value of his purchase, for no one could foresee the amount of claims that might be made against the vessel in other countries. It would also compel us to inquire in each case whether such foreign court could have taken cognizance of the claim, either by original proceeding or by petition against the proceeds of sale, and, as the foreign law in each case must be proved as a question of fact, the errors and confusion into which we should fall will be readily appreciated.

The truth is that all these liens are inchoate rights, subject to the contingency of loss in case of disaster to the vessel

necessitating a sale by the master, or in case judicial pro-
ceedings are taken against her in a foreign country to subject
her to claims recognized by the law of such country.   The
recognition of liens, and the order in which they shall be mar-
shalled and paid, pertain to the remedy, and are administered
according to the *lex fori*.   When the courts of such country
have obtained jurisdiction of the *res* by actual seizure, they
have full power to dispose of the property and to transfer the
title, and such transfer will ordinarily be respected in every
other country.   Nor is this power limited to the final deter-
mination of the case.   The title to property sold *pendente lite*
will be respected in another country, though the proceedings
upon which the property was originally seized fail.   *Stringer*
v. *The Marine Ins. Co.* L. R. 4 Q. B. 676.

In these cases of judicial sales *in rem* the liens of credit-
ors are not extinguished, but are merely transferred from the
*res* itself to the fund in court.   The decree of the maritime
court deprived the libellant in this case of no right of prop-
erty.   It was merely adjudged that his claim was not of that
character which entitled him to set the machinery of the court
in motion.   It does not follow that the court would not have
entertained a petition by the libellant for payment from the
proceeds of sale, after the satisfaction of what under the laws
of Canada are maritime liens, upon proof that by the *lex loci
contractus* he was entitled to a lien.   It is a constant practice
in our courts of admiralty to decree the payment of surplus
proceeds to mortgagees and others having liens which are
not enforceable by original proceedings.   As Mr. Justice Story
observes, (Conflict of Laws, § 322*b*:) "Where the lien or priv-
ilege is created by the *lex loci contractus*, it will generally,
though not universally, be respected and enforced in all places
where the property is found, or where the right can be bene-
ficially enforced by the *lex fori*.   And on the other hand,
where the lien or privilege does not exist in the place of the
contract, it will not be allowed in another country, although
the local law where the suit is brought would otherwise sus-
tain it."   Section 323: "But the recognition of the existence

and validity of such liens by foreign countries is not to be confounded with the giving them a superiority or priority over all other liens and rights justly acquired in such foreign countries under their own laws, merely because the former liens in the country where they first attached had there, by law or by custom, such a superiority or priority." In *Harrison* v. *Sterry*, 5 Cranch, 289, Chief Justice Marshall used the following language: "The law of the place where the contract is made is, generally speaking, the law of the contract; that is, it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and rather a personal privilege, dependent upon the law of the place where the property lies, and where the court sits which is to decide the cause."

It is believed to be the rule of the English as well as American courts of admiralty, after the payment of maritime liens, to direct the surplus proceeds to be paid over to any one who may have a lien upon such proceeds by the law of the place where the contract from which the lien arose is made; or, at least, to retain the fund in court until the court of chancery shall have made an order for its distribution. *The Flora*, 1 Hagg. 298; *The Harmonie*, 1 W. Rob. 178; *The Nordstjernen*, Swab. 260; *The Gustaf*, 6 L. T. (N. S.) 660.

But even if the foreign court should misjudge this question, and hold that, by the law of Ohio, the libellant had no lien at all upon the vessel, or should deny his petition for payment from the remnants in court, the sale would not thereby be invalidated, or the vessel remain subject to arrest in this country. This was the precise question decided in *Castrique* v. *Imrie*, L. R. 4 H. of L. 427. That was an action of trover by the assignee of a mortgagee for the conversion of the ship Ann Martin. Defendant claimed title as purchaser at a judicial sale in France. The question arose whether the proceedings in the French civil tribunal were *in personam* or *in rem*. It was held that the sale ordered was not of the interest of the owner in the ship, as upon execution, but of the ship itself; and that such sale divested the title of the

plaintiff, although he had set up his mortgage in the French court, and that court had disallowed it under a misapprehension of his rights under the English law.

In delivering the opinion of the court of exchequer chamber, on appeal from the common pleas, Mr. Justice Blackburn remarked: "We think the inquiry is—*First*, whether the subject matter was so situated as to be within the lawful control of the state under authority of which the court exists; and, *secondly*, whether the sovereign authority of that state has conferred on the court power to decide as to the disposition of the thing, and the court has acted within its jurisdiction." The judgment of the exchequer chamber was affirmed by the house of lords, their lordships holding that the error of the French court in construing the law of England did not render its judgment void in a foreign country, although it would have been otherwise in a case of fraud, and that they were bound to give it effect, at least so far as to sustain the validity of the sale.

The fact that the vessel in this case was sold for the small sum of $1,000, is due to a multiplicity of causes, amongst others the uncertainty of the law; but in the absence of fraud it cannot be considered an element in the decision of the case. I am clearly of the opinion that the sale was valid, and vested a complete title to the property in the purchaser. The libel must be dismissed.

As the cases of *The Kate Moffatt* and *The Gladiator* differ from this only in the fact that libellants' claims were rejected upon the ground that the maritime court had no authority to enforce liens which accrued before the passage of the act creating the court, a like disposition will be made of them.