THE RALEIGH.

WARD v. THE RALEIGH.

(*Circuit Court, S. D. New York. December 29, 1888.*)

MARITIME LIENS—DISCHARGE BY SALE OF VESSEL.
 A wrecked vessel was sold by the master, for a small sum, to one of the surveyors who recommended the sale, and the master appears to have contracted for employment upon the vessel. The sale was made, however, with the approval of the underwriters who had insured the vessel, and who, after a thorough examination of the wreck, regarded it as impracticable to raise the

vessel, and advised a sale; and before the sale the owners had made an abandonment to the underwriters, and the underwriters paid insurance as for a total loss. The sale was had at public auction, after due notice, and the vessel was bought by the highest bidder at the sale. At the time of the sale it was doubtful whether the vessel was worth the cost of salvage. After a large sum was expended upon the vessel for repairs, she was libeled for supplies furnished previous to the time she was wrecked. *Held*, that the pre-existing liens were discharged by the sale of the vessel, and that the purchaser had established a valid title, notwithstanding he was one of the surveyors who recommended the sale, and the relations between the master and himself were such as to excite suspicion.

In Admiralty. On appeal from district court, 32 Fed. Rep. 633.

Libels by Madgett, Ward and Wilder against the steam-ship Raleigh for advances and supplies. Decree dismissing libels, and Ward appeals.

*Owen & Gray*, for claimants.

*Henry D. Hotchkiss*, for libelant.

WALLACE, J. The testimony in this case has been read with the assistance of an extremely able and thorough argument of counsel. It has been considered in view of the rule that the burden of proof is upon the purchaser of a vessel, who asserts that pre-existing liens have been divested by his purchase on a sale by the master, to show a valid title, and consequently to prove that the master was justified in making the sale by adequate necessity, and acted in entire good faith for the interest of all concerned. Abb. Shipp. 16; *The Glasgow*, 1 Swab. 145; *The Australia*, Id. 480; *The Tilton*, 5 Mason, 465; *Freeman* v. *East India Co.*, 5 Barn. & Ald. 622; *Stephenson* v. *Insurance Co.*, 54 Me. 55; *The Sarah Ann*, 13 Pet. 402; *The Henry*, Blatchf. & H. 465; *The Amelia*, 6 Wall. 18; *Hartman* v. *Will*, 4 Pa. Law J. 110. The very small sum realized by the master and paid by the purchaser, the purchase by a person who was one of the surveyors who recommended the sale, and the fiduciary relations which supervened between the master and the purchaser immediately after the sale, and have existed ever since, are features of the transaction which give it an unfavorable coloring, and militate against its apparent integrity sufficiently to require an ample vindication. Nevertheless, the evidence justifies the conclusion that the exigencies of the situation justified the sale as the only means of realizing anything whatever out of the wrecked vessel, and that the master acted in entire good faith in the transaction.

It will not be profitable to enter upon an extended statement of the evidence, or of the reasons for the conclusions reached. The steamer was wrecked on the 20th of January, 1886, being driven ashore by the ice in the Chesapeake bay, about 17 miles from the city of Baltimore. Efforts were made to get the vessel off, unsuccessfully, with the assistance of a powerful ice-boat. Thereafter, and on the same day, the master went to Baltimore to obtain assistance, and notified the owners by telegram, and consulted the agent of the Boston Marine Insurance Company, underwriters on the vessel. The owners gave notice of abandonment to the insurers. At the suggestion of the agent of the underwriters the master applied to Mr. Pentz, who subsequently became the purchaser

of the vessel, and who was agent of the Baltimore Wrecking Company, for assistance in saving the vessel. The next day the master, Mr. Pentz, Capt. Freeman, (agent of the Boston Marine Insurance Company,) and others visited the steamer to examine her. As a result of the examination Mr. Pentz, on behalf of the wrecking company, offered to raise her, and bring her into port, for $3,000. The master refused to accept this proposition until he had consulted with the owners. The following day Mr. Pentz, Capt. Freeman, Capt. Hayes, surveyor for the Phœnix Insurance Company, (which company had reinsured the risk of the Boston Marine Insurance Company,) with others, again visited the steamer, and found her apparently a broken wreck. Her condition and situation were such that Mr. Pentz withdrew the proposition for raising her, made the day before. The next day a survey was held upon the steamer by three surveyors, of whom Mr. Pentz was one and they reported that in their opinion it was impracticable to save the vessel, and recommended the master to strip and abandon her. On the next day (January 24th) Capt. Trecartin, surveyor of the Boston Marine Insurance Company, who had been sent expressly from New York to examine the steamer, visited her, with the master and others, and came to the conclusion that she was not worth the expense of raising, and recommended that everything should be taken off, and the hull and cargo sold. The master adopted this recommendation, and about a week after stripped the vessel.

The evidence does not authorize a suspicion of bad faith on the part of the master up to this time in the history of the transaction, but shows that he abandoned the project of raising the vessel, and concluded to sell her, with the acquiescence and approval of the owners and underwriters, upon the advice of competent experts, and upon his own honest judgment that she was not worth the expense of salvage and repairs. The report and recommendation of the surveyors, although of value as formal evidence, are far less valuable as exhibiting the real condition of the vessel, and the apparent impracticability of attempting to raise and repair her, than the *consensus* of opinion of the agents and experts of the underwriters, and of other competent judges who saw her before she was raised, so far as this opinion can be ascertained from unprejudiced or reliable witnesses. The vessel was not advertised for sale until February 26th, when, upon consultation between the master and the underwriters, the cargo and the vessel were advertised to be sold separately, but at the same time and place. About that time the underwriters paid the insurance to the owners as upon a total loss. It is probable, although there is no direct testimony to this effect, that in the mean time the master came to an understanding with Mr. Pentz, looking to his own employment in the event of a purchase of the vessel by the latter. Mr. Pentz was the manager of a towing company and of a wrecking company, and his circumstances were such as to render it probable that he might be induced to take the chances of a speculation with the vessel. It was apparent to the master that there was no chance of inducing those interested in the vessel to incur the expense of raising and repairing her, that his occupation was gone, and that he must seek other employment.

He owed them no duty except to see that the vessel was sold for the best price that could be got. Under these circumstances it was natural for him to seek to induce Mr. Pentz to purchase her with a view of obtaining employment himself in raising and repairing the vessel. This conduct was not necessarily inconsistent with his duty as a fiduciary, but it was close to the line of disloyalty; and if there were any fair doubt that the sale was honestly conducted, or that the vessel was sold for all she was worth, the fact that such an understanding was in the minds of the master and Mr. Pentz would justify the most unfavorable conclusion. But the sale was made at public auction to the highest bidder, upon competition, after reasonable notice by publication in a newspaper as well calculated to give publicity as any which could have been selected. Several weeks elapsed before an attempt was made to raise the steamer. It cost about $3,100 to do so, and about $1,300 was realized by the sale of the cargo. After the expense of raising her had been incurred, and she was brought to Baltimore, it was doubtful whether she was worth repairing; and nothing was done towards repairing her until the following October. No doubt is entertained that she produced every cent that could have been obtained for her by the master at the time of the sale, or at any time after he concluded to sell her, and before she was raised. Although the sum realized was insignificant, nothing at all could have been realized in any other way than by a sale. The owners and underwriters appear to have been satisfied, and apparently did not expect that anything appreciable would be realized, because they did not attend the sale, or make efforts to find a purchaser. They undoubtedly believed that the purchaser would only buy a chance in a lottery. This was really all he did buy, according to the great preponderance of the testimony respecting the condition and situation of the vessel at the time of the sale. It is a circumstance of some significance that the principal parties who have asserted liens against her were aware of the material facts relating to her loss and sale, and made no attempt to libel her until August, 1887, when the purchaser had expended over $10,000 in repairs. It is obvious that the survey was a mere formality, and was not intended to and did not influence the judgment of the master or the underwriters; and the fact that Mr. Pentz was one of the surveyors, under these circumstances, is not important. *The Australia,* 1 Swab. 480; Pars. Mar. Ins. 147. Nor is there anything in the circumstance that he employed another to bid for him at the sale which impeaches his good faith. It is difficult to imagine what his motive was in doing this, but it is frequently done when there is no improper motive. It may be he thought that if he appeared as a bidder competition might be stimulated. If this was his notion it was nevertheless legitimate for him to employ another to bid. In view of the conclusion that the claimant acquired a valid title under his purchase of the steamer, it is unnecessary to consider the other defenses which are relied upon. A decree is ordered dismissing the libel, with costs of the district court and of this court.