## THE YARKAND.

(District Court, S. D. Alabama. July 30, 1902.)

1. SHIPPING—AUTHORITY OF MASTER TO SELL SHIP—NECESSITY.

A master, by virtue of his general authority, has no right to sell the ship in a distant port and in the course of a voyage, but his authority in that respect rests upon necessity solely, and upon the particular emergencies of the occasion. If the circumstances are such that a person of prudent and sound mind, after carefully observing all the facts and weighing all the probabilities, could have no doubt as to the advisability of a sale, the master, acting in good faith, may make such sale and give a good title.

2. SAME—STRANDED VESSEL—RECOMMENDATION OF SURVEYORS.

The master of a stranded ship is justified in giving great weight to the judgment of a board of competent surveyors selected to examine the vessel, and in selling her as she lies, on their recommendation, where he concurs in their opinion that she cannot be floated within a reasonable expense, and is in great danger of total loss, although she may be subsequently rescued and repaired by the purchaser at an expense which saves a material part of her value.

**8. SAME—VALIDITY OF SALE BY MASTER.**
The Russian ship Yarkand stranded in the night on the coast of the Gulf of Mexico between Pensacola and Mobile Bay. The second day thereafter the master notified the owners by cable, and also the Russian vice consul at Pensacola. The latter, who was also agent for the insurers, selected three competent surveyors, and with them visited and examined the vessel four days after she stranded. She was lying broadside on the beach, bedded in the sand to a depth of 9 feet, heavily listed, bilged, and filled with water to the level of the surrounding sea. Her crew had left her, and were camped on the shore. The surveyors were unanimously of opinion that she could not be salved within a reasonable expense; that she was in great peril from storms; and recommended that she be sold, if possible, fixing her value as she lay at $1,500. The master and vice consul both concurred in their opinion, and two days later, the master, not having heard from the owners, sold her for $1,600. and executed a bill of sale. She was subsequently floated by the purchaser, repaired, and converted into a barge. The owners, on learning of the stranding, abandoned her to the insurer, which brought suit to recover possession after she had been salved. *Held*, that under the circumstances the master had authority to make the sale, and the purchaser acquired a valid title, there being no question of the master's good faith.

In Admiralty. Action by insurer to recover possession of a ship sold by the master while lying stranded.

J. C. Avery and McIntosh & Rich, for libelants.
Gregory L. & H. T. Smith, for claimant.

TOULMIN, District Judge. This is a suit to recover the possession of the ship. On the night of December 29, 1900, she went aground on the beach about 18 miles eastwardly from Sand Island light, near the entrance to Mobile Bay, exposed to the winds and waves of the Gulf of Mexico. On learning of the stranding of the ship soon after it happened, and before this libel was filed, her owners abandoned her to the insurers. The libelants were the insurers under contract with the owners, and accepted the abandonment. D. C. Eitzen, the Russian vice consul stationed at the port of Pensacola, Fla., and who was also the agent of the insurers, appointed a board of surveyors to examine and inquire into the condition of the ship. The board consisted of S. C. Cobb, surveyor for the American Bureau of Shipping, Jacob Kryger, surveyor for the National Board of Underwriters, and Robert H. Langford, ship carpenter and master builder, all of Pensacola. In their report the surveyors valued the ship, as she was lying stranded on the beach, at $1,500. They expressed the opinion that she could not be gotten off within a reasonable expense, and recommended that she be sold, and, if she could not be sold, as she was lying, for $1,500, that the master strip the vessel at once, in order to dispose of all material on her to the best advantage. The survey took place on January 2, 1901. On January 4, 1901, the master of the ship sold her, and executed a bill of sale therefor, to W. H. Northrup, for $1,600. The ship was subsequently gotten off the beach, towed to Pensacola, and converted into a barge. Her value was variously estimated by the witnesses, some of whom had seen her after the survey and before she was gotten off the beach. They differed widely in their opinions of her value,

117 F.—22

both as she was lying on the beach and if she were afloat and in repair. On January 5th—the day after the sale—another survey was had by appointment of the Russian vice consul at the port of Mobile. The surveyors, in their report, described the situation of the ship, expressed the opinion that she could be salved at an expense that would justify the effort to save her, and recommended that the effort be made. It is contended on the part of libelants that the master had no authority to sell the ship; that there was no necessity for it; that the master was unwilling to make such sale, but was urged by said Eitzen and others to immediately sell her at private sale; and that, yielding to their importunities, he accordingly executed the bill of sale. It is further contended that the consideration was grossly inadequate, and that the sale was fraudulent and void. It is contended by the claimant that, while the master had no express authority to sell the ship, he acted under his implied authority as master, and was justified in doing so by the circumstances of the case.

While it is charged in the libel that the sale was fraudulent and void, it is not shown by the proof, or claimed in the argument of counsel, that there was any fraud or want of good faith on the part of the master in making the sale. But it is insisted by counsel that the master did not act on his own judgment, and that he was unduly influenced. The conduct of the Russian vice consul, Eitzen, in connection with the sale, is especially criticised, and it is suggested that his action and advice in the matter was improper, or at least suspicious. It appears from the evidence that Eitzen did have something to do with the sale, in so far, at least, as aiding the master to find a purchaser, and perhaps in bringing the purchaser and the master together, and in expressing his opinion as to the advisability of a sale. But I see nothing in this that was improper or unreasonable, in view of the fact that he was the representative of the nation to which the ship belonged, and was also the agent of the insurers of the ship. The ship was a Russian ship. She belonged to a distant foreign port, where her owners resided. The insurers were likewise foreign and in a distant country. It was not unnatural that the consular representative of the country to which the ship belonged, and agent of her insurers, should manifest much interest in the matter; and to whom would the master more naturally look for counsel and aid than to such representative and agent? But suppose Eitzen was unduly active in urging a sale, and was acting in bad faith or from improper motives, as intimated by libelants' counsel, how would that affect the sale made by the master, if he acted in good faith, and was justified by the circumstances of the case? The master, through the vice consul, called to his aid disinterested persons of experience, who were competent to advise, after a survey of the vessel and her injuries, as far as they could be ascertained, whether it were better to attempt to save and repair her or to sell her; and, as said by the supreme court in the case of The Amelie, 6 Wall. 18, 18 L. Ed. 806: "Although his authority to sell does not depend on their recommendation; yet, if they advise a sale, and he acts on their advice, he is in a condition to furnish the court reviewing the proceedings such evidence in justification of his conduct." Two of the three sur-

veyors appointed by the Russian vice consul Eitzen, testified in the case with intelligence and clearness and in detail as to the situation of the vessel, and why they considered her in great peril, and of little value, as she lay on the beach. They were shown to have had large experience in such matters, and to have been entirely disinterested. It appeared that the third surveyor had died since the survey, but he, too, was shown to be thoroughly competent and experienced, and as having fully concurred in the views expressed by his colleagues. The testimony of the two surveyors, who were witnesses in the case, was, in substance, that the ship was lying almost broadside on the beach; bedded about nine feet in the sand, and heavily listed off and towards the shore, with water in her up to tide-water mark, and with five feet of water at the stern. The sea was breaking against her side. The crew had left her, and were camped on shore. She was bilged, and water was ebbing and flowing in her, the water being the same height in the vessel as on the outside. The ship was at the time lying still, but the water in her was washing even with and the same as the water on the outside of her. Her position was a very hazardous one, and in their opinion her peril was to her full extent,—that she was too badly bilged ever to be gotten off, and they believed she never could be gotten off. There were fish of considerable size swimming in the water in the vessel, which indicated that there was quite a large hole in her bottom. They could not examine the vessel below the water line. She had about 600 tons of ballast in her, and the water covered the ballast. There was every indication of a gale of wind, and they then believed the vessel was in danger of capsizing, and being pounded to pieces. The master of the ship testified on the part of libelants, and, among other things, said that his ship went aground on December 29, 1900, at night, and on December 31st he sent a cable to the owners of the ship, and a telegram to the Russian vice consul, Eitzen, telling them the condition of the ship, and that she was full of water; that there was water in her hold as high as there was on the outside of her. He saw that the deck was a little bent amidships upward, and the pitch from the seams broken. He could not see that she was started anywhere else. That the crew left the ship and camped on shore. He further stated: That the ship was sold on January 4th, some time about 6 o'clock in the evening. That he understood it was to Saunders & Co. That he got this understanding from Eitzen, who made the trade for the sale. He did not talk with anybody else about the sale of the ship except Eitzen. A few hours before the sale Eitzen told him he could get the full sum at which the ship was valued by the surveyors, and he thought it a good bargain. That he signed the bill of sale about 6 o'clock, January 4th. Did not know W. H. Northrup, and does not know whether he was present when the bill of sale was signed. There were several persons present, but he did not know who they all were. That Eitzen told him he was representing the underwriters, and had authority from them to sell the ship. That Eitzen said, "In such cases as that, nothing else could be done except to sell the ship, and that he got the power from them, or something of that kind." That what witness understood Eitzen to mean was

that in such a case there was nothing else that could be done except to sell the ship. Witness received a part of the purchase money, and left the balance with R. A. Hyer, the ship's agent, to pay her bills. He requested Eitzen to bring the surveyors aboard to examine the vessel, and Eitzen came with them. Witness received no directions from the owners of the ship, and no answer at all, to his cable. He further stated that he was trying to do the best for the underwriters and for the owners, and he believed at the time he signed the bill of sale that he was doing the best for all concerned; that he agreed in opinion with the surveyors that the ship was in danger of being lost, and that he would not have signed the bill of sale if he had not had that opinion. W. H. Northrup testified for claimant that he was the purchaser of the ship. That he and the master negotiated the trade for her; that they had several interviews on the subject before the trade was finally consummated in Eitzen's office; that they met there by previous agreement; that Eitzen was present in his office at the time, but took no special part in the transaction. Eitzen had some conversation with the master there, but did not make the trade with witness, or have any negotiations with him about it further than to ask him, on the same day, and before he had seen the master on the subject, if he could not do something towards helping the master out in the sale of the ship. Eitzen's testimony on this point was substantially the same as that of witness Northrup. He further stated that about noon on the day of the sale R. A. Hyer said to him that Northrup or Saunders would give $1,600 for the ship; that he told Hyer the master must be seen about it, and he would bring them together; that later on that day Northrup and the master did meet at his office, and that they dealt directly together; that witness said to the master that he thought he made a good bargain, and that it was the best thing that could be done, in which the master fully agreed. Witness stated that he saw the ship on the beach at least twice between the time she stranded and the day of sale, and that his opinion, as a seafaring man of considerable experience, was at the time that she could not be saved, and would become a total loss; that he had no interest in the purchase of the ship. B. C. Tunison testified that he was an attorney at law, and prepared the bill of sale at the request of the purchaser, and he was present at the signing of it by the master, and was a witness to his signature. He stated that the master expressed to him satisfaction at having closed the trade, and reiterated several times after the sale that the ship was in imminent danger, and he believed her bottom was out, and that she could not be gotten off. He said he "had the $1,600, and the purchaser the ship with the bottom out." There was evidence that tended to show that one Saunders was interested with Northrup in the purchase of the ship.

To entitle the libelants to recover, the sale by the master must have been without authority, and void. "To justify the sale by the master of his vessel in a distant port, and in the course of her voyage, good faith in making the sale and a necessity for it must both concur; and the purchaser, in order to have a valid title, must show their concurrence." The Amelie, 6 Wall. 18, 18 L. Ed. 806. The master,

by virtue of his general authority, had no right to sell the ship. His authority in this respect rested upon necessity solely, and upon the particular emergencies of the occasion. His duty was to communicate with the owners, advise them of the facts, and take their directions, if such communication was easy and practicable. If notice to the owners was not easy and practicable, or, if given, and the master failed to ascertain their wishes within a reasonable time, then he was authorized to act upon the necessity and emergencies of the occasion as they then appeared to him from all the lights before him. This necessity is a question of fact to be determined by the circumstances in which the master was placed. The Amelie, supra; 20 Am. & Eng. Enc. Law (2d Ed.) 210–212; Astsrup v. Lewy (D. C.) 19 Fed. 536. Communication with the owners was practicable, if not very easy. It could be had by cable, and it appears that on December 31, 1900,—the second day after the accident,—the master gave notice by cable of the stranding of the ship. The proof was that an answer by cable could be had and ordinarily was had in from 16 to 24 hours, at the outside, between Pensacola, Fla., whence the master's telegram was sent, and Abo, Finland, the residence of the owners, to which it was sent. The proof further was that the master received no directions—in fact no answer of any sort—from the owners. On the fifth day after his communication to them he sold the ship as stated. The master had before him the report of the surveyors, in which they stated the situation of the ship, the value they placed on her as she was then lying on the beach, their opinion that she could not be floated within a reasonable expense, and their recommendation that she be sold. He had the opinion and advice of the vice consul of his government and agent of the insurers, who had been a seafaring man, and of experience; and the master himself fully concurred in the opinions and views thus expressed. In case of necessity the master has the power to sell. If the sale is justified by necessity, it is valid. It is held by the authorities that this is neither a legal necessity nor a physical necessity, but a moral necessity. Par. Mar. Law, 60. Mr. Justice Story, in the case of The Fortitude, 3 Sumn. 228, Fed. Cas. No. 4,953, defines the meaning of "moral necessity." He says: "Moral necessity arises where there is a duty incumbent upon a rational being to perform, which he ought at the time to perform. It presupposes a power of volition and action under circumstances in which he ought to act, but in which he is not actually compelled to act by overwhelming, superior force." "It is perhaps safe to say that, if the circumstances are such that a person of prudent and sound mind, after carefully observing all the facts and weighing all probabilities, could have no doubt as to the advisability of a sale, then a sale will be justified." "So, if a vessel is stranded, and the actual and immediate prospective danger menaces a probable loss, the master is justified in selling, regardless of the condition of the vessel." 20 Am. & Eng. Enc. Law (2d Ed.) 212, 213. "The necessity for the sale is to be determined by the circumstances as they must have appeared at the time of the sale, and not by any subsequent event. Therefore the sale of a shipwrecked vessel is not

to be invalidated merely because the vessel was afterwards rescued and repaired." 20 Am. & Eng. Enc. Law, supra; The Raleigh (C. C.) 37 Fed. 125. "The peril of the ship cannot be measured by the ultimate result of the efforts to save her." Hall v. Insurance Co. (C. C.) 37 Fed. 371. The supreme court, in the case of The Amelie, supra, said: "What course so proper to pursue as to obtain the advice of that body of men who, by the usage of trade, have been immemorially resorted to on such occasions?"

If it be suggested that the fact that the ship was floated, saved, and restored to a material part of her original value disproves the necessity for the sale, it may be answered, in the language of the supreme court in the case last cited (The Amelie):

"Not so. It may tend to prove the surveyors were mistaken, but does not affect the duty of the master to follow their advice, when given in such strong terms, and with no evidence before him that it was erroneous."

In the case of The Sarah Ann, 13 Pet. 387, 10 L. Ed. 213, Mr. Justice Wayne said:

"Nor can the necessity for a sale be denied when the peril, in the opinion of those capable of forming a judgment, makes a loss probable, though the vessel may in a short time afterwards be got off and put afloat. It is true, the opinion or judgment of competent persons may be falsified by the event, and their judgment may be shown to have been erroneous by the better knowledge of other persons, showing it was probable that the vessel could have been extricated from her peril without great injury or incurring great expense; and the master's incompetency to form a judgment or to act with a proper discretion in the case may be shown. But from the mere fact of the vessel having been extricated from her peril no presumption can be raised of the master's incompetency, or of that of his advisers."

The master's statement that Eitzen made the trade for the sale of the ship, and the implication thereby that he, in executing the bill of sale, was only carrying out Eitzen's contract and dictation, is contradicted by the testimony of Northrup, Eitzen, and Tunison. Eitzen, no doubt, found the purchaser, and brought him and the master together; but that the trade was actually made by the master, and not unwillingly made by him, I think there can be no doubt from the testimony. I apprehend that the master, being unfamiliar with the English language, did not express himself with accuracy or clearness, and did not say in his testimony exactly what he meant. The fact that the ship was subsequently gotten off the beach and put afloat within a reasonable expense, as compared with her value when afloat, may show that the surveyors on whose advice the master acted in selling the ship were mistaken in their opinion or judgment as to the practicability of getting the ship afloat, and as to her value; but these subsequent events do not affect the duty of the master to follow their advice, when given as it was, and with no evidence before him that it was erroneous. The Amelie, supra; The Sarah Ann, supra; 20 Am. & Eng. Enc. Law (2d Ed.) 213. I think "the circumstances were such that a person of prudent and sound mind, after carefully observing all the facts and weighing all probabilities, could have no doubt as to the advisability of a sale," and that the

sale by the master was justified. My conclusion is that the claimant acquired a valid title under his purchase of the ship.

A decree will be entered dismissing the libel at the cost of the libelants.